# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMITÉ DE APOYO A LOS
TRABAJADORES AGRÍCOLAS, et al.,

             Plaintiffs,

   v.

HILDA SOLIS, et al.,

             Defendants.

CIVIL ACTION

No. 09-240

Pollak, J.                                                     August 30, 2010

## OPINION

Plaintiffs Comité de Apoyo a los Trabajadores Agrícolas ("CATA"), Pineros y Campesinos Unidos del Noroeste ("PCUN"), Alliance of Forest Workers and Harvesters ("the Alliance"), and Salvador Martinez Barrera challenge various regulations concerning the H-2B worker program promulgated in concurrent rulemakings by two defendant federal agencies, the Department of Labor ("DOL") and the Department of Homeland Security ("DHS"). The case is now before this court on the parties' cross-motions for summary judgment (docket nos. 49 & 56). Also pending are (1) plaintiffs' motion to supplement the administrative record and take judicial notice (docket no. 48), and (2) plaintiffs' request for a preliminary injunction (docket no. 58).

### I. Factual Background

The regulations at issue in this case, which took effect on January 18, 2009, deal with so-called H-2B workers. As defined by the Immigration and Nationality Act ("INA"), an H-2B

1

worker is an alien who "ha[s] a residence in a foreign country which he has no intention of abandoning who is coming to the United States to perform [non-agricultural] temporary service or labor if unemployed persons capable of performing such service or labor cannot be found in this country."  8 U.S.C. § 1101(a)(15)(H)(ii)(b).[1]

The INA provides the Attorney General with authority to issue regulations concerning the admission of H-2B workers to the United States.  *See id.* § 1184(a)(1).  In particular, the INA mandates that "[t]he question of importing any alien as a nonimmigrant under subparagraph (H). . . (excluding nonimmigrants under section 1101(a)(15)(H)(i)(b1) . . . ) in any specific case or specific cases shall be determined by the Attorney General, after consultation with appropriate agencies of the Government [including DOL] upon petition of the importing employer."  *Id.* § 1184(c)(1).  The Homeland Security Act of 2002 transferred this authority from the Attorney General to the Secretary of Homeland Security.  *See* 6 U.S.C. § 236(b).

DOL also plays a key role in the admission of H-2B workers.  Pursuant to 8 C.F.R. § 214.2(h)(6)(iii)(A), "[p]rior to filing a petition . . . to classify an alien as an H-2B worker, the [petitioning employer] shall apply for a temporary labor certification with the Secretary of Labor."  This certification constitutes "advice . . . on whether or not United States workers capable of performing the temporary services or labor are available and whether or not the alien's employment will adversely affect the wages and working conditions of similarly employed United States workers."  *Id.*  DHS, meanwhile, possesses the statutory authority to sanction

---

[1]      Such workers are called "H-2B" workers after the subsection of the INA containing this definition.  They are to be distinguished from, *inter alia*, H-1B workers, who are in "specialty occupation[s]," and H-2A agricultural workers.  *See* 8 U.S.C. §§ 1101(a)(15)(H)(i)(b) & (a)(15)(H)(ii)(a).

"substantial failure[s by employers] to meet any of the conditions of the petition to admit or

otherwise provide status to a nonimmigrant worker . . . or a willful misrepresentation of a

material fact in such petition." 8 U.S.C. § 1184(c)(14)(A). The Secretary of DHS has delegated

this authority in part to the United States Customs and Immigration Service ("USCIS"). *See*

Defs.' Mem. at 6. DHS's authority was, however, partially delegated to DOL pursuant to DHS's

2009 rules and in accordance with 8 U.S.C. § 1184(c)(14)(B).[2]

The DOL procedures governing H-2B applications have historically been different, and

less formal, than the procedures addressing H-2A agricultural applications under 8 U.S.C.

§ 1101(a)(15)(H)(ii)(a); until 2009, DOL has regulated H-2B applications via a series of General

Administration Letters ("GALs") and Training and Employment Guidance Letters ("TEGLs"),

which were promulgated without notice and comment. *See* Pls.' Mem. at 4-5; Defs.' Mem. at 6.

Under that prior regime, in order to receive DOL certification, employers submitted applications

for H-2B workers to the applicable State Workforce Agency ("SWA"). Pls.' Mem. at 5; Defs.'

Mem. at 7. Under the most recent TEGL, issued in 2006, an employer's application had to

include, *inter alia*, (1) "[d]ocumentation of any efforts to advertise and recruit U.S. workers prior

to filing the application," (2) "[a] detailed statement explaining (a) why the job opportunity and

number of workers being requested reflect a temporary need, and (b) how the employer's request

. . . meets one of the standards of a one-time occurrence, a seasonal need, a peakload need, or an

intermittent need," and (3) "[s]upporting evidence and documentation that justifies the chosen

---

[2]      8 U.S.C. § 1184(c)(14)(B) provides that "[t]he Secretary of Homeland Security
may delegate to the Secretary of Labor, with the agreement of the Secretary of Labor, any of the
authority given to the Secretary of Homeland Security [to 'impose . . . administrative remedies']
under [§ 1184(c)(14)(A)(i)]."

standard of temporary need." A 148.[3]

In reviewing the application, the SWA would "determine the prevailing wage." *Id.* at

149. Before 2005, prevailing wage determinations were primarily made under the Davis-Bacon

Act ("DBA"), 40 U.S.C. §§ 276a *et seq.*, and McNamara-O'Hara Service Contract Act ("SCA"),

41 U.S.C. § 351, but a 2005 wage guidance letter, issued by DOL without notice and comment,

altered the policy such that, in the absence of any applicable collective bargaining agreement

("CBA"), DOL's main source of data became the Occupational Employment Statistics ("OES")

Survey. Pls.' Mem. at 6-7. Employers were also allowed to submit their own data, including

DBA and SCA wage rates. *See* A 79.

The SWA's review extended to other issues as well. "If the job offer [was] less than full-

time, offer[ed] to pay a wage below the prevailing wage, contain[ed] unduly restrictive job

requirements or a combination of duties not normal to the occupation, or ha[d] terms and

conditions of employment which otherwise inhibit[ed] the effective recruitment . . . of U.S.

workers . . ., or [was] otherwise unacceptable, the SWA . . . advise[d] the employer to correct the

deficiencies." *Id.* at 150. Below-prevailing wage applications could also not be accepted. *Id.* at

149. If the offer passed muster, the SWA would recruit U.S. workers for the job by (1) placing it

into its "job bank system for 10 calendar days," (2) referring "qualified applicants" to the posting,

---

[3]     While the TEGLs and GALs previously governing the H-2B program are the partial
subject of plaintiffs' contested motion to expand the administrative record and take judicial
notice, it is uncontested that this court may take judicial notice of these documents. *See Anspach
v. City of Phila.*, 503 F.3d 256, 273 n.11 (3d Cir. 2007) (noting that documents in the Federal
Register may be noticed); *Kos Pharma., Inc. v. Andrx Corp.*, 369 F.3d 700, 705 n.5 (3d Cir.
2004) (holding that documents found on an agency's website were noticeable as "public
records"); *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1197 (3d Cir.
1993) (stating that "letter decisions of government agencies" and "published reports of
administrative bodies" are noticeable).

and (3) instructing the employer to "advertise the job opportunity in a newspaper of general circulation for 3 consecutive calendar days or in a readily available professional, trade or ethnic publication." *Id.* at 150. As part of domestic recruitment efforts, employers were also required to contact "union and other recruitment sources, appropriate for the occupation and customary in the industry" and to show that these sources were "either unable to refer qualified U.S. workers or [were] non-responsive to the employer's request." *Id.*

In addition, the SWA would forward all of the appropriate information to a DOL certifying officer, who would "determine whether there are other appropriate sources of workers from which the employer should have recruited." *Id.* at 151. The certifying officer further decided to certify or reject the application, based on whether (1) "[t]he nature of the employer's need is temporary," (2) "[q]ualified U.S. workers are available," (3) U.S. workers' "wages and working conditions" would be "adversely affect[ed]," and (4) "[t]he job opportunity contains requirements or conditions which preclude consideration of U.S. workers or which otherwise prevent their effective recruitment." *Id.* at 151-52. The certifying officer's decision was "the final decision of the Secretary of Labor" and could not be appealed within DOL, but was "*advisory* to the USCIS." *Id.* at 153. The employer could then "submit countervailing evidence directly to the USCIS" to challenge DOL's decision. *Id.*

On May 22, 2008, DOL issued a notice of proposed rulemaking ("NPRM") concerning the certification process for the H-2B program, citing as justification for the proposed changes its workload and descriptions of the existing process "as complicated, time-consuming, inefficient, and dependent upon the expenditure of considerable resources by employers." 73 Fed. Reg. 29942, 29944 (May 22, 2008). Comments were due on July 7, 2008. *See* Pls.' Mem. at 7 (citing

a refusal to extend that deadline). The new regulations were published on December 19, 2008. *See* 73 Fed. Reg. 78020 (Dec. 19, 2008). Meanwhile, DHS promulgated an NPRM regarding H-2B visas on August 20, 2008. *See* 73 Fed. Reg. 49109 (Aug. 20, 2008). DHS's new regulations also became final on December 19, 2008. *See* 73 Fed. Reg. 78104 (Dec. 19, 2008).

The new regulations contain numerous significant changes from the prior regime. For instance, a DOL certification must now accompany petitions for the admission of H-2B workers, and although the new regulations create an intra-DOL appeals process, there is no external procedure for challenging the denial of a certification by DOL. *See* 8 C.F.R. § 214.2(h)(6)(iv)(A); 20 C.F.R. § 655.33(a). Moreover, the centerpiece of the certification process is no longer an SWA assessment but rather an attestation filed by the employer stating that it has fulfilled the processes and obligations imposed on it by the regulations. 20 C.F.R. § 655.15(b). Attestations must generally be filed by each employer, but where a job contractor is involved, DOL's practice allows the contractor – and not the employers who will utilize H-2B labor – to file for a certification. *See* Defs.' Mem. at 50.

As part of the attestation process, employers must, *inter alia*, (1) maintain a job posting with the relevant SWA for ten days, (2) run a newspaper advertisement on two days, including one Sunday, in a local, general-circulation newspaper (unless another sort of publication "is the most likely source to bring responses"), and (3) contact the applicable union if a collective bargaining agreement covers the job. 20 C.F.R. §§ 655.15(d)(2)-(4), (e), & (f). Employers are also required to attest that, among other things, "[t]he job opportunity is a bona fide, full-time temporary position." *Id.* § 655.22(h). "Full-time" is defined as "30 or more hours per week," unless a state or industry defines full-time at "less than 30 hours per week," *id.* § 655.4, and

"temporary" is defined (by DHS) as a "period of time . . . limited to one year or less, [except that] in the case of a one-time event [the period] could last up to 3 years," 8 C.F.R. § 214.2(h)(6)(ii)(B). The prevailing wage rate, meanwhile, is (1) generally tied to the OES survey data, as it has been since 2005, and (2) set, in the absence of a CBA, to "the arithmetic mean . . . of the wages of workers similarly situated at the skill level in the area of intended employment." 20 C.F.R. § 655.10(b)(2).

DOL "will grant the application if and only if the employer has met all the requirements" of the attestation process. *Id.* § 655.32(b). DOL also has the authority to "conduct audits of H-2B temporary labor certification applications." *Id.* § 655.24(a). Violations of the certification or audit processes can result in exclusion from the program. *Id.* §§ 655.24(d), 655.31.

Plaintiffs challenge seven aspects of the new regulations under the Administrative Procedures Act ("APA"). This court must, however, first consider two jurisdictional issues raised by defendants.

## II. Jurisdictional Issues

Defendants argue that (1) plaintiffs do not have standing to sue, and (2) the contested decisions are committed to agency discretion by law.

### A. Standing

"Standing implicates both constitutional requirements and prudential concerns." *Common Cause of Pa. v. Pennsylvania*, 558 F.3d 249, 257 (3d Cir. 2009). Constitutional standing includes three elements: "'(1) an injury in fact (i.e., a concrete and particularized invasion of a legally protected interest); (2) causation (i.e., a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (i.e., it

is likely and not merely speculative that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit).'" *Common Cause of Pa.*, 558 F.3d at 257 (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 128 S. Ct. 2531, 2535 (2008)). An injury-in-fact is "a palpable and distinct harm" that "'affect[s] the plaintiff in a personal and individual way.'" *Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 138 (3d Cir. 2009) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992)). To satisfy the causation prong, "[t]he plaintiff must establish that the defendant's challenged actions, not the actions of some third party, caused the plaintiff's injury." *Id.* at 142. And the redressability prong "looks forward" to determine whether there is "a 'substantial likelihood'" that the injury in fact can be remedied by a judicial decision. *Id.* at 143 (quoting *Vt. Agency of Natural Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000)). "'The party invoking federal jurisdiction bears the burden of establishing these elements,'" and, on summary judgment, "cannot rely on mere allegations 'but must set forth by affidavit or other evidence specific facts'" demonstrating that these requirements have been met. *Joint Stock Soc'y v. UDV N. Am., Inc.*, 266 F.3d 164, 175 (3d Cir. 2001) (quoting *Defenders of Wildlife*, 555 U.S. at 561) (internal citation omitted).

Prudential standing, meanwhile, "'require[s] that (1) a litigant assert his [] own legal interests rather than those of third parties, (2) courts refrain from adjudicating abstract questions of wide public significance which amount to generalized grievances, and (3) a litigant demonstrate that her interests are arguably within the zone of interests intended to be protected by the statute, rule, or constitutional provision on which the claim is based." *Oxford Assocs. v. Waste Sys. Auth. of E. Montgomery County*, 271 F.3d 140, 146 (3d Cir. 2001) (quoting *Davis v. Phila. Hous. Auth.*, 121 F.3d 92, 96 (3d Cir. 1997)).

"[A]n association has standing to bring suit on behalf of its own members" if either (1) the association itself satisfies the constitutional and prudential requirements, or (2) three conditions are met: "(a) [the association's] members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). In order to meet the first prong of this test – which, like the second prong, is constitutional, *see United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 555-56 (1996) – organizational plaintiffs must "identify members who have suffered the requisite harm," *Summers v. Earth Island Institute*, 129 S. Ct. 1142, 1152 (2009). The third prong, which is prudential, *Brown Group*, 517 U.S. at 556, will generally be satisfied "'[i]f in a proper case the association seeks a declaration, injunction, or some other form of prospective relief.'" *Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 284 (3d Cir. 2002) (quoting *Hunt*, 432 U.S. at 343).

### (1) PCUN

According to its president, Ramon Ramirez, plaintiff PCUN is "a union that represents the interests of its member workers in reforestation and in agriculture." Ramirez decl. ¶ 3. Because PCUN as an organization has suffered no harm from the regulations at issue, the initial question to be determined is whether PCUN's "members would otherwise have standing to sue in their own right." *Hunt*, 432 U.S. at 343. According to Ramirez, (1) some of PCUN's members "are subject to regulation under the H-2B program" and are "in competition . . . with workers who are admitted . . . under the H-2B program," and, (2) their "wages, . . . working conditions,

and . . . ability to obtain and retain jobs" have, as a result, been adversely affected by the new H-2B regulations.  Ramirez decl. ¶ 8.  This states an injury in fact, and one which Ramirez's declaration states is caused by the new regulations.  *See id.* ¶ 10.  The traceability prong is further satisfied by the declaration of Ismael Perez, a PCUN member, who states that between 1999 and 2008, his family reforestation business was successful, but that since then, the business "ha[s] not been able to win any contracts," losing out to "contractors [who] use [H-2B] workers."  Perez decl. ¶¶ 5-6.  Given that PCUN seeks the invalidation of the new regulations that caused their injury, the redressability prong is met.[4]  So, too, is the requirement that PCUN proffer an individual member who has suffered harm: Perez's declaration establishes that his family business has lost contracts and work to employers who use H-2B workers at the wages and conditions available under the new regulations.  *See id.* ¶¶ 5-8, 10-11.

PCUN's members also would have prudential standing to challenge the regulations.  They would be litigating their own interests, and would not be litigating generalized grievances, in that their injuries are economic ones specifically borne by U.S. workers in the same industries as H-2B workers.  It is uncontested, meanwhile, that Perez and PCUN's other U.S. resident members fall within the zone of interests protected by the INA.  *See, e.g.*, *Int'l Longshoremen's & Warehousemen's Union v. Meese*, 891 F.2d 1374, 1379 (9th Cir. 1989) ("A primary purpose of the immigration laws . . . is to protect American laborers.").  In short, PCUN has satisfied the

---

[4]	Defendants argue that any injury suffered by plaintiffs is not redressable, because, if plaintiffs prevail, this court could do no more than remand the regulations to the agencies without vacating them.  But defendants' argument would, if accepted, prevent standing in the vast majority of APA cases.  Further, defendants admit that "the agencies would take appropriate corrective action," Defs.' Supp. Resp. at 3, which is tantamount to an admission that there is a "substantial likelihood" of redress on remand.

first prong of *Hunt*.

According to Ramirez, PCUN "represent[s] the interests of its [individual] members in reforestation work" and "temporary work in other industries" "to improve their wages and working conditions." Ramirez decl. ¶¶ 4, 6. Because PCUN's members "are in competition or face competition for jobs with workers who are admitted for temporary employment under the H-2B program," *id.* ¶ 5, PCUN's asserted interest in "challenging the actions of [DOL] with respect to the H-2B program" that it believes adversely affect its members' wages and working conditions, *id.* ¶ 10, is "germane to the organization's purpose," *Hunt*, 432 U.S. at 343. Further, the relief PCUN and the other plaintiffs seek – the invalidation of certain portions of the 2009 DOL and DHS regulations – is prospective in nature, and defendants do not argue that this remedy would not "inure to the benefit of [any] members of the association actually injured." *Pa. Psychiatric Soc'y*, 280 F.3d at 284 (internal quotation marks omitted). PCUN therefore satisfies the second and third prongs of the *Hunt* test, and it has standing to bring this challenge.

### (2) The Remaining Plaintiffs

Because "the presence of one plaintiff with standing is sufficient to satisfy that requirement," *Forum for Academic & Institutional Rights v. Rumsfeld*, 390 F.3d 219, 228 n.7 (3d Cir. 2004) (citing *Bowsher v. Synar*, 478 U.S. 714, 721 (1986)), *rev'd on other grounds*, 547 U.S. 47 (2006), I do not consider whether the remaining plaintiffs have standing to sue.[5]

---

[5] In a supplemental brief (docket no. 78) addressing standing submitted pursuant to this court's order of June 8, 2010, defendant moves to strike affidavits in support of standing filed by the plaintiffs on May 28, 2010, June 10, 2010, and June 13, 2010. Insofar as the motion seeks to strike the affidavits submitted on May 28, the motion will be denied; at the hearing on the cross-summary judgment motions, this court, instead of striking these affidavits, provided defendants with an opportunity to respond to them. Insofar as the motion seeks to strike the affidavits filed in June, meanwhile, the motion will be dismissed as moot, because nothing in the

## B. Agency Discretion

The Administrative Procedure Act ("APA") "establish[es] a broad presumption in favor of [judicial] reviewability" of administrative actions. *Davis Enters. v. Envt'l Protection Agency*, 877 F.2d 1181, 1184-85 (3d Cir. 1989) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971)). Narrow exceptions to this rule prevent judicial review, however, where (1) such review is expressly prohibited by statute, or (2) "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). The second exception applies where there are "no judicially manageable standards . . . available for judging how and when an agency should exercise its discretion," *Heckler v. Chaney*, 470 U.S. 821, 830 (1985), which is to say that "'there is no law to apply,'" *Webster v. Doe*, 486 U.S. 592, 599 (1988) (quoting *Overton Park*, 401 U.S. at 410).

Courts in this circuit consider three factors in determining whether there is law to apply: whether the action (1) "involves broad discretion, not just the limited discretion inherent in every agency action," (2) "is the product of political, military, economic, or managerial choices that are not readily subject to judicial review," and (3) "does not involve charges that the agency lacked jurisdiction, that the decision was motivated by impermissible influences such as bribery or fraud, or that the decision violates a constitutional, statutory, or regulatory command." *Davis Enters.*, 877 F.2d at 1185. In determining the scope of the agency's discretion, "agency regulations or internal policies [may] provide sufficient guidance to make possible federal review . . . even absent express statutory limits on agency discretion." *Id.*; *accord Raymond Proffitt Found. v. U.S. Army Corps of Eng'rs*, 343 F.3d 199, 206 (3d Cir. 2003). A "list[ of] factors the

---

above analysis depends on representations made in those affidavits.

agency must consider in reaching a decision" sufficiently cabins agency discretion to allow for meaningful review. *Davis Enters.*, 877 F.2d at 1186.

In this case, DHS's governing regulations do contain judicially manageable standards to apply in evaluating DOL's actions. Specifically, pursuant to 8 C.F.R. § 214.2(h)(6)(iv)(A), DOL certifications must "stat[e] that qualified workers in the United States are not available and that the alien's employment will not adversely affect wages and working conditions of similarly employed United States workers." This language provides two specific "factors the agency must consider in reaching a decision," *Davis Enters.*, 877 F.2d at 1186, and also indicates that a prime purpose of DOL's certification is to protect U.S. workers. No more is needed to conclude that DOL's discretion is narrow enough to allow for meaningful judicial review. *See, e.g.*, *Int'l Longshoremen's & Warehousemen's Union*, 891 F.2d at 1379 (holding that "Congress' enunciated purpose to protect American jobs" provided "law to apply").

As to the second *Davis Enterprises* factor, neither the issue of whether or not American workers are available nor the question of whether wages and working conditions have been affected involves complex, technical issues. Moreover, that these questions may be partially economic in nature is irrelevant: "where there is a specific statutory directive, such as that the benefits of a project exceed its cost, the matter has been held to be judicially reviewable" even when economics is involved. *Local 2855, AFGE v. United States*, 602 F.2d 574, 580 n.13 (3d Cir. 1979). And because this case does, in part, involve claims that DOL's "decision violates a constitutional, statutory, or regulatory command," *Davis Enters.*, 877 F.2d at 1185, the third

*Davis* factor also presents no bar to judicial review.[6]

This court accordingly has jurisdiction to consider plaintiffs' challenges.

### III. The Merits

Pursuant to the APA, "the reviewing court" must "hold unlawful and set aside agency action, findings, and conclusions" that are, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Judicial review [under the APA] focuses on the agency's decision making process[,] not on the decision itself," *NVE, Inc. v. Dep't of Health & Human Servs.*, 436 F.3d 182, 190 (3d Cir. 2006); thus, "a court is not to substitute its judgment for that of the agency," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* "[A]n agency rule would [normally] be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in

---

[6]    The government nevertheless asserts that 8 C.F.R. § 214.2 cannot provide a basis for review because "the Court cannot evaluate legislative rules based on the very legislative rules that are being challenged." Defs.' Reply at 4. But even assuming that such circularity would present a problem, it is absent in this case for two reasons. First, the government's challenge to justiciability only applies to the DOL regulations, not § 214.2. Second, although § 214.2(h)(6)(iv)(A) – which constrains DOL's discretion – was amended by DHS's 2009 rules, the standards for certification listed in that subsection were *not* changed in that rulemaking. Both the pre- and post-amendment versions of the regulation require DOL certifications to state that qualified American workers were unavailable and that U.S. wages and working conditions would not be adversely impacted.

view or the product of agency expertise." *Id.*

## A. Recruitment Regulations

Plaintiffs' first challenge is to the portions of DOL's new regulations that "determin[e] when 'unemployed persons capable of performing such service or labor cannot be found in this country.'" Pls.' Mem. at 11 (quoting 8 U.S.C. § 1101(a)(15)(H)(ii)(b)). Plaintiffs argue that various aspects of these recruitment regulations (1) violate the INA and controlling DHS regulations, (2) are arbitrarily different from the regulations governing H-2A agricultural workers, and (3) include changes that were made in the absence of any reasoned explanation.

### (1) Searches for U.S. Workers and the INA

Subsection (H)(ii)(b) defines an H-2B workers as someone who "ha[s] a residence in a foreign country which he has no intention of abandoning who is coming to the United States to perform [non-agricultural] temporary service or labor if unemployed persons capable of performing such service or labor cannot be found in this country." Plaintiffs read this section as requiring a national – as opposed to local – search for available American workers, and they argue that DOL's revised regulations, which require recruitment only in "the area of intended employment," 20 C.F.R. §§ 655.15(e) & (f), violate that statutory command.

At argument in this case, both parties analyzed this issue under the two-step procedure in *Chevron, U.S.A, Inc. v. NRDC*, 467 U.S. 837 (1984).[7] Pursuant to *Chevron*, this court must first determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the

---

[7] Accordingly, I do not consider whether or not DOL's interpretation of the INA is, in fact, entitled to *Chevron* deference.

agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. If, by contrast, "Congress has not directly addressed the precise question at issue," the question becomes "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. If the agency's interpretation is a "reasonable" one, this court defers to that interpretation. *Id.* at 845.

The INA does not speak directly to the issue of whether a national search for domestic labor must precede the use of H-2B employees. Congress's use of the word "find" does suggest that some search for "unemployed persons capable of performing [the temporary] service or labor" is necessary. And it is at least possible that "in this country" means *anywhere* in this country." But because subsection (H)(ii)(b) earlier speaks of workers with "a residence in a foreign country," the reference to "persons . . . in this country" may also quite reasonably be read to distinguish American workers from foreign workers. Read in that way, the statute simply requires that H-2B workers be used only when American workers cannot be used, without specifying the scope of any required search for U.S. workers.

Finding no clear congressional intent on the question raised by plaintiffs, I turn to DOL's proffered interpretation of the statute as expressed in the regulations, which is that it "require[s] employers to recruit U.S. workers in the area of intended employment." Defs.' Reply at 9. That interpretation is consistent with the second reading of the statute above. The agency's interpretation is therefore a reasonable one which passes muster under *Chevron*.

### (2) Attestations and the Governing Law

DOL's new regulations allow employers to complete their recruitment of U.S. workers before applying for a temporary labor certification and to "attest . . . to having performed all

required steps of the recruitment process" as part of that application.  20 C.F.R. § 655.15(b); *see also id.* § 655.22(c) (requiring an attestation that, among other things, "the employer has conducted the required recruitment[] in accordance with the regulations").  DOL then "review[s] complete applications for an absence of errors that would prevent certification and for compliance with the criteria for certification."  *Id.* § 655.23(b).  Plaintiffs contend that this attestation process violates 8 U.S.C. § 1184(c)(1), which states that "[t]he question of importing any alien as a nonimmigrant [under provisions including (H)(ii)(b)] in any specific case . . . shall be determined by the Attorney General [now the Secretary of DHS], after consultation with appropriate agencies of the Government, upon petition of the importing employer."  Plaintiffs also argue that the process contravenes 8 C.F.R. § 214.2(h)(6)(iii)(A), a DHS regulation which mandates, in pertinent part, that "[t]he labor certification shall be advice . . . on whether United States workers capable of performing the temporary services or labor are available and whether or not the alien's employment will adversely affect the wages and working conditions of similarly employed United States workers."  In particular, plaintiffs assert that both of these provisions "require[] the Secretary of Labor to make an actual determination regarding the availability of U.S. workers and the effect aliens will have on U.S. wages."  Pls.' Mem. at 13.

    Plaintiffs' argument concerning § 1184(c)(1) is again governed by *Chevron*.  And again, there is no clear congressional intents regarding the question at issue; § 1184(c)(1) mandates interagency consultation but does not speak to the form or content of the mandated consultation between DHS and agencies like DOL.  Defendants' interpretation of the statute as allowing DOL to receive attestations from prospective employers of H-2B workers, meanwhile, is reasonable and not precluded by the statute.

17

As for the language of 8 C.F.R. § 214.2(h)(6)(iii)(A), even assuming, *arguendo*, that

plaintiffs are correct in believing that the regulation mandates an "actual determination"

concerning whether U.S. workers are available and the effects of H-2B workers on wages and

working conditions, this requirement is met:  DOL's regulations constitute an advance

determination that the attestation process, when properly followed by employers, "is an effective

means to ensure that all statutory and regulatory criteria are met."  73 Fed. Reg. at 78035.  The

attestation-based system is therefore consistent with § 214.2(h)(6)(iii)(A).

### (3) Comparison with the H-2A Program

Plaintiffs further argue that DOL's new recruitment regulations are arbitrary within the

meaning of the APA because they are less protective of U.S. workers than the regulations

governing H-2A temporary agricultural workers.[8]  But, while Congress was concerned with the

protection of American workers in crafting both the H-2A program and the H-2B program, the

INA includes much more detailed guidance concerning H-2A workers.  *See* 8 U.S.C. § 1188.

Given Congress's divergent approaches to H-2A and H-2B workers, DOL's similar difference in

treatment is not, as a general matter, arbitrary and capricious.  *Accord Martinez v. Reich*, 934 F.

Supp. 232, 237-28 (S.D. Tex. 1996).

Plaintiffs also assert that DOL committed a procedural violation by failing to respond to

comments which suggested the importation of features from the H-2A program to the H-2B

---

[8]     Plaintiffs also rely on the regulations governing the permanent labor certification program, which were, plaintiffs aver, highly detailed in many previous incarnations.  But plaintiffs concede that DOL altered the regulations governing permanent certifications in 2005 to be much less detailed.  *See* Pls.' Mem. at 23-24.  I am, moreover, unpersuaded that the sole remaining difference plaintiffs identify between the H-2B program and the permanent program – the length of time that SWA job orders for domestic workers is left open – renders DOL's choices in implementing the H-2B program arbitrary.

context.  As a rule, an "agency 'need not address every comment [it receives], but it must respond in a reasoned manner to those that raise significant problems.'"  *City of Waukesha v. EPA*, 320 F.3d 228, 257 (D.C. Cir. 2003) (quoting *Reytblatt v. Nuclear Regulatory Comm'n*, 105 F.3d 715, 722 (D.C. Cir. 1997)).  A comment is significant enough to require a response if it "'demonstrates that the agency's decision was not based on a consideration of the relevant factors,'" *id.* at 258 (quoting *Tex. Mun. Power Agency v. EPA*, 89 F.3d 858, 876 (D.C. Cir. 1996)); *accord Citizens for Health v. Thompson*, No. 03-cv-2267, 2004 WL 765356, at *13 (E.D. Pa. Apr. 2, 2004), or if the comment, "'if true, . . . would require a change in the proposed rule,'" *La. Fed. Land Bank Ass'n v. Farm Credit Admin.*, 336 F.3d 1075, 1080 (D.C. Cir. 2003) (quoting *Am. Mining Cong. v. EPA*, 907 F.2d 1179, 1188 (D.C. Cir. 1990)).

Here, plaintiffs point to a comment submitted by plaintiffs' lead counsel on behalf of the organizational plaintiffs and numerous other groups.  *See* DOL R. 929.  One page of that comment[9] suggests that the H-2B program be brought into line with the H-2A program in three respects – by mandating (1) more extensive recruitment, (2) interstate recruitment, and (3) the provision of free housing and transportation to H-2B workers.  *Id.* at 995.  DOL did fail to respond to these comments, but no response was required.  In suggesting free housing and transit, counsel's comment does no more than note that "this is a requirement in agriculture," and the other two suggestions come with only slightly more detail – in one case, a citation to the domestic unemployment rate, and in the other, the bare assertion that the H-2A recruitment requirements involve "the kinds of affirmative strategies that would be expected actually to

---

[9]     Plaintiffs argue the comment more extensively discusses differences between the H-2A and H-2B regimes, but the remaining pages to which plaintiffs cite are not on point.

locate and attract employees to the work." *Id.* Given this extreme terseness, DOL's choice not to respond to these comments does not demonstrate that it failed to consider relevant factors such as the protection of U.S. workers. Moreover, because of both the comments' lack of detail and Congress's more protective treatment of U.S. workers in the H-2A context, none of plaintiffs' counsel's assertions would, if true, "require a change in the proposed rule." *La. Fed. Land Bank Ass'n*, 336 F.3d at 1080. Accordingly, although an ideal agency may have responded to these comments, DOL was under no compulsion to do so.

### (4) Whether DOL Issued Reasoned Explanations

Finally, plaintiffs aver that several portions of the recruitment regulations are arbitrary because they include changes for which DOL provided no explanation. To survive challenges of this type, DOL must show only that, in making the challenged alterations, it "'considered the relevant factors and articulated a rational connection between the facts found and the choice made.'" *W.R. Grace & Co. v. EPA*, 261 F.3d 330, 338 (3d Cir. 2001) (quoting *S.W. Pa. Growth Alliance v. Browner*, 121 F.3d 106, 111 (3d Cir. 1997)). "[P]ost hoc rationalizations for agency action," however, are insufficient: "[A]n agency's order must be upheld on the same basis articulated in the order by the agency itself." *Id.* "Moreover, while a decision of less than ideal clarity will be upheld if the agency's path may be reasonably discerned, [courts] will not search the record to find support for the agency's decision unless its 'conclusions [are] . . . readily apparent' so that 'broad inferential leaps of logic [are] not needed to reach the determinations.'" *Id.* (quoting *Marshall v. Lansing*, 839 F.2d 933, 944 (3d Cir. 1988)) (internal citation omitted). In short, "the agency must show that there are good reasons for the new policy. But it need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the

reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *FCC v. Fox Television Stations, Inc.*, 129 S. Ct. 1800, 1811 (2009).

At the most general level, plaintiffs argue that DOL provided no explanation for its shift from active oversight of employer certifications to an attestation system. But the Department did, in fact, explain its shift by (1) stating "that an attestation-based application, backed by audits . . . is an effective means to ensure that all statutory and regulatory criteria are met and all program requirements are satisfied," 73 Fed. Reg. at 78035, and (2) expressing concern that the prior process was complicated, "time-consuming, inefficient, and dependent upon the expenditure of considerable resources by employers." *Id.* at 29944. These statements are sufficient to show that DOL "considered the relevant factors and articulated a rational connection between the facts found and" its choice to move to a system of attestations. *W.R. Grace & Co.*, 261 F.3d at 338.

Plaintiffs similarly challenge three more specific and interrelated changes: (1) the removal of the prior ability of DOL officials to "determine whether there are other appropriate sources of workers from which the employer should have recruited in order to obtain qualified U.S. workers," A 151, (2) the omission in the new regulations of DOL's prior ability to "consider U.S. workers who are willing to move from elsewhere to take the job," *id.*, and (3) the removal of the prior requirement that employers contact unspecified "other recruitment sources, appropriate for the occupation and customary in the industry," *id.* at 150. Plaintiffs argue that these changes were made without explanation, but DOL's concern with the inefficiency and time-intensiveness

of the prior regulatory regime sufficiently explains these three changes, each of which streamlines and standardizes the recruitment process. *See WorldCom, Inc. v. FCC*, 238 F.3d 449, 459 (D.C. Cir. 2001) (holding that "the FCC's decision to make ease of administration and enforceability a consideration in setting [a] standard" was not arbitrary).

Plaintiffs also argue that DOL's new regulations governing the use of newspaper advertisements to recruit U.S. workers were issued without explanation. Specifically, plaintiffs contest the change from (1) language allowing SWAs to require employers to advertise in "readily available professional, trade or ethnic publication[s]" when doing so was "most appropriate for the occupation and most likely to bring responses to U.S. workers," A 150, to (2) language permitting the use of specialized publications so long as advertisements in those publications do "not replace the [mandated] Sunday advertisement" in a newspaper of general circulation, 20 C.F.R. § 655.15(f)(4). Both the removal of SWAs from the advertising process and the change regarding alternative publications were, however, addressed by the agency. In the NPRM, DOL stated that allowing "employers to place their own newspaper advertisements . . . acknowledges industry practice and needs, while maintaining accountability and worker protection." 73 Fed. Reg. at 29949. The agency further noted that its regulations were intended both to recognize that "most employers seek to comply with recruitment requirements" and to prevent employers from "demonstrat[ing] apparent compliance with advertisements in newspapers having low circulations and which are the least likely publications to be read." 73 Fed. Reg. at 29949. After receiving comments on the advertising regulations, DOL reiterated its belief in the new policy, noting that "appropriate publication may vary, for example by industry or industry practice." *Id.* at 78034. It also specifically addressed, and provided reasons for

rejecting, a comment suggesting the "the SWA should be involved in the process and provide guidance regarding newspaper choices." *Id.* DOL, in other words, both considered what type of advertising regime would best serve both workers and employers and enunciated its belief that the chosen regulation attains that goal. No more is required of the agency.

Plaintiffs' last challenge to the recruitment regulations is that DOL provided no explanation for altering its rules concerning recruitment from unions. The NPRM proposed to perpetuate DOL's prior policy, which required employers to contact unions "in circumstances where it is appropriate for the occupation and customary to the industry." 73 Fed. Reg. at 29948; *see also* A 150. In the final rule, however, DOL decided not to require employers to contact unions unless the employer "is already a party to a collective bargaining agreement that covers the occupation at the worksite that is the subject of the H-2B application." 73 Fed. Reg. at 78032; *see also* 20 C.F.R. § 655.15(g). In the preamble to the final rule, DOL listed numerous types of comments critical of the NPRM's version of the union requirement, including the concern that employers would not know when contacting unions was "appropriate for the occupation and customary to the industry and area of intended employment." 73 Fed. Reg. at 78032. The agency responded to these comments as follows:

> The Department has considered these comments and agrees with the many concerns raised about the proposed requirement, in particular concerns about vagueness and ambiguity, and the dilemma employers would face in trying to interpret and implement the requirement. Accordingly, we have revised the provision to require an employer to contact a labor organization only in cases where the employer is already a party to a collective bargaining agreement that covers the occupation at the worksite that is the subject of the H-2B application.

*Id.*

Thus, while DOL received numerous comments that were critical of the union

requirement, its only expressly stated rationale for removing it was that the NPRM's version of the requirement was ambiguously worded. This rationale is, to be sure, rationally connected to changing the proposed rule in some way. But there is no indication whatsoever that DOL considered the protection of U.S. workers in announcing its vagueness rationale, or that it considered changing the rule in other ways that would be equally consistent with its view that the NPRM was ambiguous. In short, DOL's rationale does not either (1) demonstrate that its decision "was based on a consideration of the relevant factors," *State Farm*, 463 U.S. at 43, or (2) present a "rational connection between the facts found and the choice made," *W.R. Grace & Co.*, 261 F.3d at 338 (internal quotation marks omitted).

DOL's "agreem[ent] with the many concerns raised about the proposed requirement" is also insufficient to provide an explanation. This statement neither "identifies the major policy issues raised" by the requirement nor "*coherently* explains why the agency resolved the issues as it did." *Nat'l Mining Ass'n v. Mine Safety & Health Admin.*, 512 F.3d 696, 700 (D.C. Cir. 2008) (emphasis supplied). To put the point another way, any "conclusions" that might be drawn from DOL's agreement are simply not "readily apparent." *W.R. Grace & Co.*, 261 F.3d at 338.[10] DOL's change in policy regarding union contacts was therefore arbitrary and in violation of the APA.

_____

[10]     Defendants' brief argues that DOL abandoned the union rule because of "the limited effectiveness that unions have in referring unemployed workers to H-2B employers." Defs.' Mem. at 42. The language of the preamble to the final rule, however, discloses no such reasoning – and, of the numerous comments discussed in the preamble, only one, which "opined . . . that . . . unions will not refer workers to non-union shops," 73 Fed. Reg. at 78032, contains reasoning that is even arguably related to defendants' representation. This court is therefore bound to reject defendants' claim as a "*post hoc* rationalization." *W.R. Grace & Co.*, 261 F.3d at 338.

## B. "Full-Time"

In its new regulations, DOL defined, for the first time in the context of the H-2B program, the term "full-time." In the NPRM, DOL defined full-time as "35 or more hours per week, except where a State or an established practice in an industry has developed a definition of full-time employment for any occupation that is less than 35 hours per week, that definition shall have precedence." 73 Fed. Reg. at 29961. The final rule, by contrast, lowered the relevant threshold from 35 hours to 30 hours per week. *See id.* at 78054-55. The preamble to the final rule also stated, for the first time, that "[t]he parameters set forth in the definition of 'full time' refer to the number of hours that are generally perceived to constitute that type of employment, as distinguished from 'part time,' and are not a requirement that an employer offer a certain number of hours or any other terms or conditions of employment." *Id.* at 78024.

### (1) 30 Hours

Plaintiffs raise two interrelated challenges to this definition. First, they challenge the change from 35 hours to 30 hours per week as arbitrary, in part by asserting that DOL offered no rational explanation for the alteration. That statement is correct: While the final rule contains five statements arguably relevant to the number of hours constituting full-time work, none of the statements explains DOL's change. The final rule, for example, states that "[t]he Department has . . . decided to retain [certain] proposed language" imposing a requirement that employers attest to providing full-time work, but this does not offer a rationale for adopting *changed* language elsewhere. 73 Fed. Reg. at 78038. Moreover, although the final rule offers an appeal to DOL's "experience in the administration of [the H-2B] program" in the context of the full-time requirement, *id.*, bare claims of expertise are insufficient to provide a rational reason for a policy

choice, *see Heartwood, Inc. v. U.S. Forest Serv.*, 73 F. Supp. 2d 962, 975 (S.D. Ill. 1999).  The preamble also states that landscapers work 35-hour weeks, *see* 73 Fed. Reg. at 78038, but while this fact might be rationally connected to a 35-hour maximum, it does not counsel defining a 30-hour week as full-time.  And although the preamble also asserts that "some industries, occupations, and States have differing definitions of what constitutes full-time employment," *id.*; *see also id.* at 29951, that statement suggests that DOL should have full discretion to choose the hours appropriate to each industry and does nothing to explain the choice of a thirty-hour week. Finally, the statement that "[t]he parameters set forth in the definition of 'full time' refer to the number of hours that are generally perceived to constitute that type of employment, as distinguished from 'part time,'" *id.* at 78024, does not provide a rational explanation for the 30-hour rule, given that DOL (1) cites no comments or other sources for this perception, (2) adheres to the view that the definition of full-time varies by industry, and (3) presumably intended the 35-hour definition in the NPRM to be a general rule of the same sort.  There is, in other words, nothing in the final rule or its preamble to suggest that DOL "considered the relevant factors and articulated a rational connection between the facts found and the choice made," *W.R. Grace & Co.*, 261 F.3d at 338 (internal quotation marks omitted), or even "*believes* [the new policy] to be better," *Fox Television Stations*, 129 S. Ct. at 1811.[11]  The revised definition will accordingly be invalidated.

### (2) "Not a Requirement"

Second, plaintiffs challenge the preamble statement stating that the 30-hour threshold is

---

[11]        Plaintiffs suggest that the weather may be a driving factor in the choice of 30 hours, but it is not "readily apparent" from the record that DOL employed this rationale.  *W.R. Grace & Co.*, 261 F.3d at 338.

"not a requirement that an employer offer a certain number of hours or any other terms or conditions of employment."  But, although defendants do not raise the issue, this statement is not a change to the substance of the regulation.  Rather, it is situated in the preamble and constitutes an interpretation by DOL of the definition of full-time included in 20 C.F.R. § 655.4.  As a result, this "court must defer to the agency's interpretation 'unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.'"  *UPMC-Braddock Hosp. v. Sebelius*, 592 F.3d 427, 436-37 (3d Cir. 2010) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)).  Here, the language of the definition of full-time is consistent with the preamble interpretation.  Specifically, the definition of full-time as "30 or more hours per week" may be read to set a standard employers must follow in order to distinguish full-time work from part-time work, without requiring that the H-2B employees actually work a certain minimum of hours each week.  The preamble interprets the regulation in precisely that manner.[12]

Plaintiffs also assert that the preamble statement was adopted without notice and comment.  This argument raises the question of whether the preamble statement is a legislative rule that must undergo notice and comment procedures or whether, by contrast, it is an interpretive rule exempt from such procedures.  *Dia Nav. Co., Ltd. v. Pomeroy*, 34 F.3d 1255, 1264 (3d Cir. 1994).  The core difference between the two types of rules is that legislative rules

---

[12]    Plaintiffs also argue that "[t]o say that [the] policy [in the preamble statement] will have an adverse effect on U.S. workers would be an understatement."  Pls.' Mem. at 34-35.  To the extent that plaintiffs thereby argue that the statement violates the INA, the argument fails.  Plaintiffs do not provide any evidence that U.S. workers in the relevant occupations are guaranteed a particular number of hours per week, nor do they explain how the preamble statement, interpreted as above, will harm U.S. workers.

"have substantive legal effect," "while interpre[tive] rules typically involve construction or clarification of a statute or regulation." *Id.* (internal quotation marks omitted). In other words, a rule is interpretive if it "is based on specific . . . provisions," but legislative if it "is based on an agency's power to exercise its judgment as to how best to implement a general . . . mandate." *Id.* (quoting *United Techs. Corp. v. EPA*, 821 F.2d 714, 719-20 (D.C. Cir. 1987)). Accordingly, in practice, rules have been found to be legislative in nature if the subject they address (1) is entirely unaddressed by other statutes and regulations, *see, e.g.*, *United States v. Ward*, No. 00-cr-681, 2001 WL 1160168, at *20 (E.D. Pa. Sept. 5, 2001), (2) is of a categorically different nature than the concerns addressed by governing statutes and formal regulations, *see id.* at *22 (discussing *Hoctor v. USDA*, 82 F.3d 165 (7th Cir. 1996)), or (3) highlights "tension if not outright inconsistency within the" statute, *Dia*, 34 F.3d at 1265 .

Although this test frequently "prove[s] to be one incapable of being drawn with much analytical precision," *id.* at 1264, no such difficulties are present here. The preamble statement plaintiffs challenge is tied very closely to the definition of "full-time" provided by 20 C.F.R. § 655.4. In fact, the statement expressly purports to be an interpretation of that definition. *See* 73 Fed. Reg. at 78024. Accordingly, DOL's statement that "[t]he parameters set forth in the definition of 'full time' . . . are not a requirement that an employer offer a certain number of hours or any other terms or conditions of employment" is an interpretive rule exempt from the APA's notice and comment requirements.[13]

_____

[13] I further note that, in determining whether a rule is legislative or interpretive, some courts have considered whether "'by its action the agency intends to create new law, rights, or duties.'" *Dia*, 34 F.3d at 1264 (quoting *United Techs. Corp.*, 821 F.2d at 718). Here, the challenged statement has none of these effects. Nor is the fact that the statement appears in the preamble to a final rule enough, standing alone, to render it legislative in nature. *See, e.g.*,

28

## C. Job Contractors

Pursuant to new 20 C.F.R. § 655.4, a "job contractor" is "a person, association, firm, or a corporation that meets the definition of an employer and who contracts services or labor on a temporary basis to one or more employers, which is not an affiliate, branch or subsidiary of the job contractor, and where the job contractor will not exercise any supervision or control in the performance of the services or labor to be performed other than hiring, paying, and firing the workers."  Plaintiffs challenge several aspects of DOL's regulations governing such contractors.

### (1) Attestations by Job Contractors

When a job contractor submits an H-2B application, it must – in addition to fulfilling the generally-applicable attestation requirements – attest that "it will not place any H-2B workers employed pursuant to the labor certification application with any other employer or at another employer's worksite unless" certain conditions obtain. *Id.* § 655.22(k).  Those conditions are that (1) the contractor "makes a bona fide inquiry" of the employer using H-2B workers "as to whether the other employer has displaced or intends to displace any similarly employed U.S. workers within the area of intended employment" and receives a negative response, and (2) "[a]ll worksites are listed on the" contractor's application. *Id.*  By contrast, it is both uncontested by the parties and implicit in § 655.22(k) that the contractor's clients – the end-point employers of H-2B workers – are exempted from any attestation requirements.

Plaintiffs argue that this exemption is inconsistent with governing DHS regulations.

---

*Barrick Goldstrike Mines, Inc. v. Browner*, 215 F.3d 45, 50 (D.C. Cir. 2000) (referring to "interpretive statements in a rulemaking preamble" and elsewhere); *Leslie Salt Co. v. United States*, 55 F.3d 1388, 1393-94 (9th Cir. 1995) (analyzing a preamble statement as an interpretive rule).

Defendants principally respond[14] that, as part of the regulatory review process, DHS endorsed DOL's regulations, and that the implicit interpretation of DHS's own regulations contained in that endorsement deserves deference. Agencies are, of course, empowered "to resolve ambiguities in [their] own regulations." *Auer v. Robbins*, 519 U.S. 452, 463 (1996). But, as noted above, "[a] reviewing court [need not] defer to the agency's interpretation [where] an alternative reading is compelled by the regulation's plain language." *UPMC-Braddock Hosp.*, 592 F.3d at 436-37 (internal quotation marks omitted).

DHS's interpretation of its regulations as requiring *only* job contractors to file for labor certifications is barred by the plain language of those regulations. 8 C.F.R. § 214.2(h)(2)(i)(C) provides that "[i]f the beneficiary [i.e., the temporary, non-immigrant worker] will perform nonagricultural services for, or receive training from, more than one employer, each employer must file a separate petition with USCIS as provided in the form instructions." 8 C.F.R. § 214.2(h)(6)(iii)(A) further provides that "[p]rior to filing a petition with the director to classify an alien as an H-2B worker, the petitioner [which is to say, the petitioning employer] shall apply for

---

[14]    At the hearing on the parties' summary judgment motions, defendants, for the first time, also argued that DOL had not been given the opportunity to pass on plaintiffs' arguments during the rulemaking, with the result that plaintiffs had failed to exhaust their administrative remedies. Assuming *arguendo* that this court may properly consider defendants' tardily-crafted claim, it does not bar the claim that DOL's regulations are inconsistent with governing DHS regulations. "'[T]he requirements of the exhaustion doctrine are also not applicable where the question is solely one of statutory interpretation.'" *Einhorn v. Kaleck Bros., Inc.*, No. 08-cv-5307, ___ F. Supp. 2d ___, 2010 WL 1957594, at *6 (D.N.J. May 17, 2010) (quoting *Flying Tiger Line v. Teamsters Pension Tr. Fund*, 830 F.2d 1241, 1253 (3d Cir. 1987)); *see also, e.g.*, *McKart v. United States*, 395 U.S. 185, 198-99 (1969) (stating that "judicial review would not be significantly aided by an additional administrative decision" when the question was one of statutory interpretation). That rule extends naturally to situations in which the question is one of interpreting the controlling regulations of a different agency. As a result, plaintiffs were under no obligation to exhaust the interpretive question at issue.

a temporary labor certification with the Secretary of Labor."[15]  Together, these provisions clearly

mandate that (1) every employer must file a petition with DHS, and (2) before doing so, the

employer must also file a certification application with DOL.  By allowing certain employers

*not* to file certification applications, DOL's regulations unambiguously contradict this mandate.

## (2) Changes to the Definition

The final definition of "job contractor" differs in several ways from the NPRM's

definition of a contractor as "a person, association, firm, or a corporation that meets the

definition of an employer and who contracts services on a temporary basis to one or more

employers unaffiliated with the job contractor *as part of signed work contracts or labor services*

*agreements*."  73 Fed. Reg. at 19961 (emphasis supplied).  In essence, the final definition (1)

made minor alterations to the wording of parts of the definition, and (2) swapped the italicized

phrase for the condition that the contractor "not exercise any supervision or control in the

performance of the services or labor to be performed other than hiring, paying, and firing the

workers."  20 C.F.R. § 655.4.  The only explanation proffered by DOL for the latter change,

which represents a departure from the agency's traditional definition of a job contractor, *see* 73

Fed. Reg. at 29956, is that it was to "make clear that the job contractor, rather than the

contractor's client, must control the work of the individual employee."  73 Fed. Reg. at 78024.

But the change, of course, did precisely the opposite – it clarified that it is the contractor's client

who "must control the work of the individual employee."  The explanation is therefore not

---

[15]     Neither of these subsections was altered in relevant part by the DHS rulemaking at
issue in this case.

rationally connected to the change, which will accordingly be invalidated as arbitrary.[16]  *See, e.g.*,

*Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n*, 59 F.3d 284, 291 (1st

Cir. 1995) (noting that an "alteration or reversal must be accompanied by some reasoning – some

indication that the shift is rational").[17]

### D. Prevailing Wage Rate

Historically, DOL relied on the prevailing wage regulations used for permanent labor

certifications, as codified at 20 C.F.R. § 656.40, to determine prevailing wages in the H-2B

program.  *See, e.g.*, A 11; A 21.  In pre-2005 versions of § 656.40(a)(1), wage rates were set at

the levels mandated by the Davis-Bacon Act ("DBA"), 40 U.S.C. §§ 276a *et seq.*, or the Service

Contract Act ("SCA"), 41 U.S.C. § 351, "if the job opportunity is in an occupation which is

subject to a wage determination" under either statute.  Where neither the DBA nor the SCA

applied, the prevailing wage rate was, until 1998, tied to either (1) "[t]he average rate of wages,

that is, the rate of wages to be determined, to the extent feasible, by adding the wage paid to

workers similarly employed in the area of intended employment and dividing the total by the

number of such workers," or (2) the wage rate included in an applicable collective bargaining

agreement.  20 C.F.R. § 656.40(a)(2)(i)-(ii).

---

[16]    Insofar as defendants argue that this claim is unexhausted, the argument must be rejected.  Because the change at issue was made in the final rule, plaintiffs and other commentors had no opportunity to raise it with the agency.

[17]    Plaintiffs mount numerous other arguments concerning the definition of "job contractor."  Each of those arguments, however, reduces to either (1) the proposition that every employer must, for various reasons, file a petition with DOL, or (2) the view that a job contractor cannot be an entity that simply hires, pays, and fires workers.  Because this court has already held those two elements of the definition to be invalid, I will not address plaintiffs' additional contentions.

In 1998, DOL issued a General Administration Letter changing the methodology for calculating wage rates where neither the DBA nor the SCA applied and in the absence of an applicable CBA. *See* A 48-58. In such circumstances, the GAL mandated the use of either (1) "the wage component of the [Occupational Employment Statistics ("OES")] program," or (2) data provided by the employer, provided that such data met certain criteria. A 49. Wages still had to be tied to "the average (arithmetic mean) of wages . . . paid to workers similarly employed in the area of intended employment." *Id.* Apparently for the first time, however, DOL defined "similarly employed" to mean "[h]aving jobs requiring a substantially similar level of skills within the area of intended employment." *Id.* at 50. Thus, for each job, the 1998 GAL mandated setting two different wage rates – one for "[b]eginning level employees who have a basic understanding of the occupation through education or experience," and the other for "[f]ully competent employees who have sufficient experience in the occupation to plan and conduct work requiring judgment and the independent evaluation, selection, modification and application of standard procedures and techniques." *Id.* at 53. It is uncontested that DOL applied the mean of the lowest one-third of wage rates in a given occupation to the lower skill level and the mean of the upper two-thirds of applicable wage rates to determine wages for the higher skill level. *See* First Am. Compl. ¶ 75; First Am. Answer ¶ 75.

In 2002, DOL issued an NPRM that proposed to end the use of DBA and SCA wages in the context of permanent certifications and instead use OES data, bifurcated according to the procedure above, as a default. Pls.' Mem. at 62 (citing sources). The parties do not dispute that, while the NPRM stated that the new system would apply to H-1B workers (who typically have

graduate educations),[18] it failed to indicate that the change would apply to the H-2B context. *See* First Am. Compl. ¶ 93; First Am. Answer ¶ 93. DOL eventually adopted the move to OES data in the permanent program in a final rule that became effective on March 28, 2005. *See* 69 Fed. Reg. 77326 (Dec. 27, 2004).

In 2004, meanwhile, Congress passed the H-1B Visa Reform Act, which states that, when DOL sets prevailing wage rates using government survey data, it must calculate "at least 4 levels of wages commensurate with experience, education, and the level of supervision." 8 U.S.C. § 1182(p)(4). When the survey has only two levels, the additional two levels are to "be created by dividing by 3 the difference between the two levels [in the data], adding the quotient thus obtained to the first level, and subtracting that quotient from the second level." *Id.*

The following year, DOL issued a Prevailing Wage Determination Policy Guidance for permanent and temporary non-agricultural labor programs. *See* A 68-105. In that guidance letter, DOL stated that the new version of § 656.40 would govern the H-2B program as well as the permanent and H-1B programs. *See* A 70. The guidance letter also applied the four-level system enunciated in 8 U.S.C. § 1182(p)(4) to all three programs. *See* A 68. It is undisputed that this guidance letter was issued without notice and comment. Pls.' Mem. at 67; Defs.' Mem. at 65.[19]

Under the challenged rulemaking, H-2B prevailing wage rates are determined in several steps. If there is an applicable collective bargaining agreement, the wage rate in that agreement is

---

18    *See supra* note 1.

19    In early 2005, DOL issued an NPRM that would have adopted the four-tier OES wage system for the H-2B program via notice and comment. *See* 70 Fed. Reg. at 3994. The NPRM was withdrawn in 2007. *See* First Am. Compl. ¶ 124; First Am. Answer ¶ 124.

used. 20 C.F.R. § 655.10(b)(1). If there is not such an agreement, "the prevailing wage for labor certification purposes shall be the arithmetic mean . . . of the wages of workers similarly employed at the skill level in the area of intended employment," using OES data. *Id.* § 655.10(b)(2).[20] Employers may alternatively submit their own wage data, including DBA and SCA wage rates, assuming certain conditions are met. *See id.* §§ 655.10(b)(3)-(5) & (f). In applying this regulation, DOL uses the four-level skill structure of the 2005 guidance letter.

Plaintiffs assert a battery of challenges against (1) the use of skill levels in setting wages, and (2) DOL's reliance on OES data in lieu of DBA and SCA wage rates. In response, defendants initially contend that plaintiffs failed to exhaust their administrative remedies on the issue of the appropriate data source.

### (1) Exhaustion

As a general matter, a party may not "raise [an] issue in [a] judicial proceeding [that] was never presented to the [agency] during the rulemaking process." *S.W. Pa. Growth Alliance*, 121 F.3d at 122. However, "'as a judicially created doctrine, the requirement of exhaustion has traditionally been waived' in those situations where 'exhaustion (would be) futile.'" *New Jersey v. Dep't of Health & Human Servs.*, 670 F.2d 1262, 1277 (3d Cir. 1981) (quoting *Susquehanna Valley Alliance v. Three Mile Island Nuclear Reactor*, 619 F.2d 231, 245 (3d Cir. 1980)). Such a situation exists here: In response to comments it received challenging the use of OES data, DOL stated that it "did not propose changes to the sources of data to be used for the prevailing wage determinations and, therefore, the[] comments are beyond the scope of the current rulemaking."

---

[20]     Where there are multiple worksites, "the prevailing wage shall be based on the highest applicable wage among all relevant worksites." *Id.* § 655.10(b)(3).

73 Fed. Reg. at 78031. In light of this flat decision to rule out comments about data sources, DOL may not now be heard to argue that plaintiffs were under an obligation to present comments on that very issue. By the agency's own admission, those comments would have been ignored. Accordingly, even assuming that the exhaustion requirement would otherwise operate to bar plaintiffs' challenge to DOL's decision to use OES data and not DBA and SCA data in setting prevailing wage rates, that requirement must, and will, be waived on the ground that the submission of any relevant comments on that issue would have been futile.

### (2) Skill Levels

20 C.F.R. § 655.10(b)(2) provides that, with certain exceptions, "the prevailing wage for labor certification purposes shall be the arithmetic mean . . . of the wages of workers similarly employed at the skill level in the area of intended employment." Despite incorporating this requirement in its new regulations, DOL has never articulated a "satisfactory explanation for [doing so] including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. The 1998 guidance letter that initially incorporated skill levels into the H-2B program did so without explanation, *see* A 48-57, and neither the NPRM nor the final rule at issue articulated any reason for using skill levels. Rather, in promulgating the rule, DOL simply noted that the "new regulatory sections are consistent with [the permanent certification regulations] and the Department's May 2005 Prevailing Wage Determination Policy Guidance, Nonagricultural Immigration Programs." 73 Fed. Reg. at 29947; *id.* at 78030. However, the permanent certification regulations unsurprisingly also contain no rationale for applying skill levels to the H-2B program. *See* 69 Fed. Reg. 77326 (Dec. 27, 2004). The 2005 guidance letter, meanwhile, simply (1) mandates that the permanent certification regulations "must be followed

36

in determining the prevailing wage," and (2) states that "[t]he same policies and procedures shall be followed for the permanent labor certification program, the nonimmigrant program pertaining to H-1B professionals in specialty occupations or as fashion models, and the H-2B temporary nonagricultural labor certification program." A 70.[21] In short, DOL has never explained its reasoning for using skill levels as part of H-2B prevailing wage determinations.[22] The insertion of skill levels in § 655.10 is therefore invalid as arbitrary.[23]

---

[21] In 2009, DOL issued another guidance letter which supersedes the 2005 letter. The newer guidance letter also does not explain DOL's reason for using skill levels in the H-2B context.

[22] The 2005 guidance letter does note Congress's passage of 8 U.S.C. § 1182(p)(4), the statute requiring that, when DOL sets prevailing wage rates using government survey data, it must calculate "at least 4 levels of wages commensurate with experience, education, and the level of supervision." The letter does not, however, expressly advance § 1182(p)(4) as a reason for applying skill levels to the H-2B program. Moreover, even if the guidance letter could be construed as using skill levels because of the statute, that explanation would be irrational. While sweeping in its terms, § 1182(p)(4) is part of the "H-1B Prevailing Wage Level" section of the "H-1B Visa Reform Act." *See* P.L. 108-447, Div. J, Title IV, § 423. Defendants concede that, as a result, "the statutory amendment ostensibly governs only to [*sic*] the H-1B program," Defs.' Mem. at 9, and therefore does not compel DOL to use skill levels in the H-2B program, *see INS v. Nat'l Center for Immigrants' Rights*, 502 U.S. 183, 189 (1991) (holding that a general term in the text of a statute was limited by the title of the paragraph containing the language). DOL has also been inconsistent in its interpretation of the reach of § 1182(p)(4), a fact which further "bears on whether the [agency] has given a reasoned explanation for its . . . position." *Nat'l Cable & Telecommc'ns Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 1001 n.4 (2005). And the agency's current practice of applying the statute to the H-1B, H-2B, and permanent programs, but not to the H-2A program, has no basis in the text of § 1182(p)(4). *See* Defs.' Mem. at 9 n.8; *see also* 75 Fed. Reg. 6884, 6900 (Feb. 12, 2010) (disavowing the use of the four-tier system in the H-2A context). Given (1) this irrationality, (2) the fact that the statute's reach is limited to the H-1B context, and (3) DOL's inconsistent interpretations of the law, any appeal to § 1182(p)(4) would not constitute a rational explanation for using skill levels in determining H-2B prevailing wage rates.

[23] *United Farm Workers v. Solis*, 697 F. Supp. 2d 5 (D.D.C. 2010), is not to the contrary. That case upheld the four-tier system with respect to the H-2A program, but it did so on the basis of statements in the Federal Register which rationally explained the system's use in that context. *See id.* at 10-11. Further, while defendants rely on *Smiley v. Citibank*, 517 U.S. 735

The specific four-tier wage structure based on skill levels that DOL uses is not contained in the 2009 regulations but rather in the 2005 guidance letter and a similar letter issued in 2009. In the absence of any valid regulatory language authorizing the use of skill levels in determining the prevailing wage rate, however, the four-tier structure of skill levels set out in the guidance letters – which is entirely untethered from any other statutory or regulatory provisions, and which affirmatively creates the wages paid to H-2B workers – constitutes a legislative rule which must be subjected to notice and comment. It has not been so subjected and it, too, is therefore invalid.

### (3) Data Sources

Plaintiffs further argue that DOL's decision to rely on OES data and not DBA and SCA data was improperly made without notice and comment. Defendants argue in response that the agency's choice is an interpretive one for which notice and comment is unnecessary. At present, the choice of data sets is made in 20 C.F.R. § 655.10, which is a legislative rule requiring notice and comment for the simple reason that it is "published . . . in the Code of Federal Regulations." *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993). As a general matter, of course, DOL's 2009 regulations were subjected to notice and comment. But, as discussed above, DOL expressly refused to consider comments concerning the choice of appropriate data sets. That choice, as reflected in § 655.10, was accordingly improperly promulgated without the acceptance and consideration of comments as required by the APA. *See* 5 U.S.C. § 553(c) (requiring agencies to "give interested persons an opportunity to participate in

_____

(1996), the portion of that case to which they cite did no more than reject a party's argument that an agency had adopted inconsistent positions on the ground that nothing that "can accurately be described as a change of official agency position ha[d] occurred." *Id.* at 742-43. This conclusion is also not inconsistent with the view that DOL's failure to explain its use of skill levels renders that use arbitrary.

the rule making through submission of written data, views, or arguments" and to engage in "consideration of the relevant matter presented").[24]

### E. Travel and Visa Expenses

In its new regulations, DOL requires employers to attest that they "ha[ve] contractually forbidden any foreign labor contractor or recruiter whom the employer engages in international recruitment of H-2B workers to seek or receive payments from prospective employees." 20 C.F.R. § 655.22(g)(2). "This provision," however, "does not prohibit employers or their agents from receiving reimbursement for costs that are the responsibility of the worker, such as government required passport or visa fees." *Id.* DHS's new regulations include the similar statement that it is "a condition of approval of an H-2B petition" that "no job placement fee or other compensation . . . be collected at any time . . . from a beneficiary of an H-2B petition . . . (other than the lower of the actual cost or fair market value of transportation to such employment and any government-mandated passport, visa, or inspection fees)." 8 C.F.R. § 214.2(h)(6)(i)(B). Plaintiffs challenge both the DOL and DHS provisions as violative of the APA.

### (1) 20 C.F.R. § 655.22(g)(2)

Plaintiffs argue that, insofar as DOL's final rule allows employers to pass on the costs of passport and visa fees to H-2B workers, it violates the notice and comment provisions of the

---

[24]        The choice to use OES data is not a creation of the 2009 rulemaking; it was first made by the 2005 guidance letter. Insofar as that letter mandated the use of OES data in calculating H-2B prevailing wage rates, however, it also was an interpretive rule. At the time the letter was issued, no statutory or regulatory language so much as mandated that DOL calculate prevailing wage rates in the H-2B context. There thus can be little question that, as applied to the H-2B program, the choice of data sets had independent substantive effect and was not merely an interpretation of an existing legislative or regulatory rule. DOL was accordingly required to subject the application of the 2005 letter to the H-2B program to notice and comment.

APA because it is not a logical outgrowth of the NPRM, which stated that the wage offered to H-2B workers "shall be held to exclude deductions for reimbursement of the employer or any third party by the employee for expenses in connection with obtaining or maintaining the H-2B employment including but not limited to international recruitment, legal fees not otherwise prohibited by this section, visa fees, items such as tools of the trade, and other items not expressly permitted by law." 73 Fed. Reg. at 29966. I assume, *arguendo*, that the final rule does not represent a logical outgrowth of this proposed language. *See generally Envtl. Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005) ("Given the strictures of notice-and-comment rulemaking, an agency's proposed rule and its final rule may differ only insofar as the latter is a 'logical outgrowth' of the former.").

When an agency violates the logical outgrowth rule, "[t]he APA" nevertheless "requires [plaintiffs] to show prejudice" from the agency's "procedural violation." *City of Waukesha*, 320 F.3d at 246 (citing 5 U.S.C. § 706); *see also, e.g.*, *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1082-83 (D.C. Cir. 2009) (considering whether plaintiffs had shown prejudice). This plaintiffs have not done. To be sure, plaintiffs argue that they will be prejudiced by the substance of the final rule. *See* Pls.' Reply at 39. They never attempt, however, to demonstrate that the claimed *procedural* violation is the cause of any resulting harm – something they might do, for instance, by showing that, "had proper notice been provided, they would have submitted additional, different comments that could have invalidated the rationale for the revised rule." *City of Waukesha*, 320 F.3d at 246; *see also, e.g.*, *Am. Airlines, Inc. v. Dep't of Transp.*, 202 F.3d 788, 797 (5th Cir. 2000) ("This continued failure to identify the evidence it would have submitted indicates that [a party] was not prejudiced by any inadequacy in [the agency's]

40

notice.").[25]  This court will accordingly reject plaintiffs' notice and comment challenge to § 655.22(g)(2).

Alternatively, plaintiffs argue that the final language in § 655.22(g)(2) is arbitrary because the change from the NPRM was made without any explanation.  DOL's policy decision is, however, explained in detail in the preamble to the final rule.  In fact, several pages of the preamble explain the agency's conclusion that employers may require H-2B workers to reimburse them for "the costs of relocation to the site of the job opportunity" consistently with the Fair Labor Standards Act ("FLSA") and other governing regulations.  73 Fed. Reg. at 78041; *see also id.* at 78039-41 (explaining DOL's view).  That this explanation occurs under a heading discussing a different subsection of § 655.22 is irrelevant, given its direct applicability to the policy decision at issue.  Moreover, while it is true that DOL subsequently disavowed the FLSA interpretation it propounded in the preamble, *see* 74 Fed. Reg. 13261, Wage & Hour Div. Field Assistance Bulletin No. 2009-2 (Aug. 21, 2009), the propriety of DOL's choice to retain the challenged language § 655.22(g)(2) thereafter is not properly before this court.  Plaintiffs have only challenged the rulemaking that resulted in the January 2009 regulations, and in that rulemaking, DOL's choice to allow employers to receive reimbursements for certain relocation costs was explained thoroughly.  Plaintiffs' challenges to § 655.22(g)(2) will therefore be rejected.

---

[25]    *City of Waukesha* suggests that "there may be situations where a [plaintiff] who challenges an agency 'logical outgrowth' argument is unable to provide a proffer of additional comments for valid reasons."  320 F.3d at 246.  As in that case, however, plaintiffs "have not offered any such reason" to waive the requirement.  *Id.*; *see also Shinseki v. Sanders*, 129 S. Ct. 1696, 1706 (2009) (noting that "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination").

### (2) 8 C.F.R. § 214.2(h)(6)(i)(B)

Plaintiffs contend that DHS's regulation allowing employers to collect "the lower of the actual cost or fair market value of transportation to such employment and any government-mandated passport, visa, or inspection fees," 8 C.F.R. § 214.2(h)(6)(i)(B), conflicts with the statement in DHS's NPRM that the agency wished "to prevent H-2B workers from incurring '*any* expenses or debt in connection with obtaining employment in the United States,'" Pls.' Mem. at 109 (quoting 73 Fed. Reg. 49109, 49113 (Aug. 20, 2008)) (emphasis in the memorandum). This argument misreads the NPRM, which speaks only of "ensur[ing] that an alien . . . has not *improperly incurred* any expenses or debt in connection with obtaining employment in the United States under the H-2B program." 73 Fed. Reg. at 49113 (emphasis supplied). The NPRM, in fact, "propose[d] that an H-2B petitioner [i.e., employer] be required to demonstrate . . . that it has reimbursed the alien beneficiary in full for any such fees or other form of compensation (other than those for which the petitioner may be reimbursed, as described in proposed 8 C.F.R. § 214.2(h)(6)(i)(B)(3))" – a subsection that included precisely the same categories of exceptions as the final rule. *Id.* The NPRM and the final rule are therefore entirely consistent with each other on this score.

Plaintiffs further argue that DHS's regulation conflicts with judicial decisions that plaintiffs characterize as "prohibit[ing] employers from passing . . . transportation and visa costs along to H-2B workers." Pls.' Mem. at 110. The cases on which plaintiffs rely, however, uniformly hold that certain statutes, including the FLSA, constrain employers' ability to seek reimbursement for such costs, and DHS's final rule similarly states that reimbursements are only allowed "to the extent that the passing of such costs to the beneficiary is not prohibited by

statute."  8 C.F.R. § 214.2(h)(6)(i)(B).  DHS's policy choice therefore does not contravene the decisions on which plaintiffs rely.

## F. "Temporary"

DHS's regulations define temporary employment as occurring "when the employer needs a worker for a limited period of time" to satisfy "a one-time occurrence, a seasonal need, a peak load need, or an intermittent need."  8 C.F.R. § 214.2(h)(6)(ii)(B). "Generally, [the specified] period of time will be limited to one year or less, but in the case of a one-time event could last up to 3 years."  *Id.*  The addition of a potential three-year term for one-time events is new, and plaintiffs challenge it as both contrary to law and arbitrary and capricious.

### (1) Temporary Work and the INA

Plaintiffs contend that DHS's inclusion of three-year projects under the heading of temporary employment violates the definition in 8 U.S.C. § 1101(a)(15)(H)(ii)(b) of an H-2B worker as one "who is coming temporarily to the United States to perform . . . temporary service or labor."  Because DHS is generally charged with applying and interpreting the INA, the two-step procedure in *Chevron* applies to determine whether DHS's regulation constitutes a permissible interpretation of the statute.  Under *Chevron* step one, Congress has not spoken directly to the issue of whether three-year work projects qualify as temporary employment: There is no definition of "temporary" or "temporarily" as used in subsection (H)(ii)(b), and the express meaning of those terms – which is "lasting for a limited time" or "existing or valid for a time (only)," Merriam-Webster Online Dictionary; *accord* Oxford English Dictionary (2d ed. 1989) –

is not determinative of whether temporary employment may last as long as three years.[26]  Further,

DHS's choice to allow three-year terms of employment in certain situations is consistent with the

mandate that H-2B employment be temporary instead of permanent.  That definition therefore

represents a reasonable interpretation of subsection (H)(ii)(b), and it will accordingly be upheld.[27]

## (2) Arbitrary and Capricious Challenge

Plaintiffs further contend that DHS's explanation for allowing three-year terms of work in

certain circumstances is irrational.  The agency's rationale is as follows:

> USCIS has determined that the general one-year limit contained in the current
> definition of a petitioner's temporary need for the services or labor performed by
> an H-2B alien, coupled with the 'extraordinary circumstances' restriction on
> period of need lasting longer than a year, is unnecessarily limiting on the
> employment opportunities that may otherwise qualify for H-2B classification.  *See*
> 8 C.F.R. 214.2(h)(6)(ii)(B). . . .
> USCIS is proposing this change because there are some employers who
> may need temporary workers for a specific project, such as the construction of a
> specific building structure (e.g., bridge, power plant) or other development, which
> will have a definable end point but may require more than one year to complete. . .
> . An employer with a multiple-year need is, however, required to retest the labor
> market annually and obtain a temporary labor certification annually. . . . USCIS
> believes that a more flexible rule that generally limits temporary work to one year
> but explicitly allows it to last up to three years better comports with the nature of

---

[26]     Plaintiffs rely on what is essentially legislative history to support their view that
the INA clearly forecloses three-year terms of employment.  But the history on which plaintiffs
rely – including a letter from the late Senator Edward Kennedy concerning DOL's past practice
and the fact that DOL had, until 2009, consistently adhered to a definition of temporary that
capped H-2B employment at one year – is, at best, exceedingly weak evidence of congressional
intent in passing the INA.  It is therefore insufficient to demonstrate that the statute compels the
invalidation of the challenged regulation.

[27]     Plaintiffs also argue that the decision to lengthen the maximum duration of H-2B
employment terms to three years demonstrates that DHS ignored the need to protect U.S.
workers.  But the decision to allow three-year terms in only one of four categories of temporary
need while forbidding permanent employment in all situations "represents a reasonable
accommodation of [the] policies that were committed to the agency's care by the statute."  *Kosak
v. Aguirre*, 518 F.3d 210, 213 (3d Cir. 2008).

temporary work in the H-2B context . . . .

73 Fed. Reg. at 49115.

This explanation "articulate[s] a rational connection between the facts found and the choice made." *W.R. Grace & Co.*, 261 F.3d at 338. Specifically, the explanation demonstrates that (1) DHS perceives that employers are likely to need H-2B workers for certain types of one-time projects, and (2) the relative flexibility of the new regulations will serve those needs better than the pre-2009 version of § 214.2, which limited employment of more than one year to extraordinary circumstances. By its explanation, then, DHS has both iterated a reason for the change rationally tied to the change itself and expressly noted that it "*believes* [the new policy] to be better." *Fox Television Stations*, 129 S. Ct. at 1811. Moreover, in (1) stating that the "opportunities" opened up by the new definition "may otherwise qualify for H-2B classification," (2) requiring annual testing of the labor market and certification, and (3) addressing, and rejecting, the concern that the three-year term would harm U.S. workers, *see* 73 Fed. Reg. at 78118, DHS considered the relevant factor of the protection of U.S. workers before extending the maximum time period of certain H-2B jobs. For these reasons, DHS did all that was required of it in altering the definition of temporary work.[28]

### G. Revocation Provisions

Finally, plaintiffs challenge the portion of the DHS regulations stating as follows:

A petitioner filing an H-2B petition within 1 year after a decision denying or

---

[28] Plaintiffs assert numerous arguments to the contrary, none of which is persuasive. In particular, although plaintiffs argue that the examples of ship- and bridge-building given by DHS are examples of permanent and not temporary work, it is conceivable that such industries would face exceptionally busy times that would require the use of temporary labor on particular projects.

revoking on notice an H-2B petition filed by the same petitioner on the basis of paragraph (h)(6)(i)(B) of this section [which prevents the collection of "job placement fee[s] or other compensation] must demonstrate to the satisfaction of USCIS, as a condition of the approval of the later petition, that the petitioner or agent, facilitator, recruiter, or similar employment service reimbursed in full each beneficiary of the denied or revoked petition from whom a prohibited fee was collected or that the petitioner has failed to locate each such beneficiary despite the petitioner's reasonable efforts to locate them. . . . Such reasonable efforts shall include contacting all of each such beneficiary's known addresses.

8 C.F.R. § 214.2(h)(6)(i)(D)(1). Unlike the final rule, the NPRM did not contain either (1) the one-year limit on this post-revocation process, or (2) the language allowing employers to make only "reasonable efforts to locate" the H-2B workers. Plaintiffs challenge both of these alterations.

### (1) "Within One Year After a Decision"

Plaintiffs first argue that DHS imposed the one-year time frame without explanation. The preamble to the final rule, however, explains that the above-quoted provision – including the limited post-revocation period in which petitioning employers need to take the enumerated extra steps – was "intended to balance . . . commenters' concerns that an H-2B alien worker should not be required to pay fees . . . with the legitimate concern that petitioners who run afoul of [the prohibition on fee collection] but have attempted in good faith to remedy their noncompliance continue to have access to the H-2B program." 73 Fed. Reg. at 78113. This explanation is an adequate justification of DHS's policy choice.

Plaintiffs next argue that the one-year limitation is arbitrary because DOL's regulations allow that agency to impose much stiffer punishments for either (1) actions "significantly injurious to . . . wages or benefits," or (2) any "single heinous act showing . . . flagrant disregard for the law." 20 C.F.R. §§ 655.13(d)(1)(i) & (d)(5). The fact that some actions might violate

both these DOL regulations and § 214.2(h)(6)(i)(D)(1), however, does not, as plaintiffs protest, render DHS's punishment scheme arbitrary. Rather, it simply means that, when violations are particularly severe, both agencies may act to punish employers who impose illegal fees on H-2B workers. Such a scheme providing for greater punishment for more egregious violations is not arbitrary.

### (2) "Reasonable Efforts"

Finally, plaintiffs claim that the "reasonable efforts" provision is arbitrary because it "gives employers a perverse incentive not to maintain adequate records and to appeal a finding that workers were charged illegal fees." Pls.' Mem. at 125. But this argument rests on the implicit and highly implausible premise that either engaging in delaying tactics or deliberately failing to maintain adequate records would constitute a "reasonable effort." Further, while plaintiffs argue that DHS "failed to consider [the] obvious alternative[]" of forcing employers to give up all of the relevant wages, *id.* at 126, the proposed rule suggested an alternative very much like that by requiring reimbursement in order to receive approval for subsequent petitions, *see* 73 Fed. Reg. at 49120. Plaintiffs have therefore failed to demonstrate that the "reasonable efforts" provision is arbitrary.

### H. Remedy

For the above reasons, this court will invalidate the following portions of DOL's 2009 rulemaking regarding the H-2B program: (1) 20 C.F.R. § 655.15(g), concerning the situations in which H-2B employers must contact unions as a potential source of labor; (2) the portion of 20 C.F.R. § 655.4 defining "full-time"; (3) 20 C.F.R. § 655.22(k), insofar as that provision permits the clients of job contractors to hire H-2B workers without submitting an application to the

Department of Labor; (4) the portion of 20 C.F.R. § 655.4 defining "job contractor" to mean an entity that "will not exercise any supervision or control in the performance of the services or labor to be performed other than hiring, paying, and firing the workers"; (5) the phrase "at the skill level" in 20 C.F.R. § 655.10(b)(2); and (6) the second sentence of 20 C.F.R. § 655.10(b)(2), concerning the data sources used to determine the prevailing wage rate. The remaining question concerns the appropriate remedy.

This court must, of course, remand this case to DOL so that the agency may correct its errors. *See, e.g., Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005). The parties disagree, however, as to whether the offending provisions should be vacated before remand. The traditional rule has been that the APA "envisions the vacation of unlawfully promulgated regulations," *Abington Mem. Hosp. v. Heckler*, 750 F.2d 242, 244 (3d Cir. 1984), but the D.C. Circuit has developed a fairly extensive jurisprudence centered around the idea that, in certain circumstances, remand without vacatur is the proper course. Specifically, in determining whether to vacate regulations that violate the APA, that court considers "the seriousness of the [rule's] deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Allied-Signal Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993). Neither the Supreme Court nor the Third Circuit has ruled on the specific permissibility of the D.C. Circuit's approach, but the flexibility it affords is valuable – especially in cases where, as here, there are no previously-promulgated former regulations to stand in for any vacated provisions. I will therefore proceed to consider whether vacatur of the invalidated regulations is warranted under the *Allied-Signal* factors.

This court invalidated three portions of DOL's regulations – those concerning union contacts, the definition of full-time work, and the definition of job contractor – on the ground that DOL provided no rational explanation for its policy choices. "'An inadequately supported rule . . . need not necessarily be vacated,'" *Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. 2009) (quoting *Allied-Signal, Inc.*, 988 F.2d at 150), and here, this court "cannot say with confidence that the Rule[s are] likely irredeemable," *Fox TV Stations, Inc. v. FCC*, 280 F.3d 1027, 1048 (D.C. Cir. 2002). Those three regulations will accordingly be remanded to DOL without vacatur.

By contrast, this court invalidated DOL's practice of requiring only job contractors, and not their employer clients, to file applications for labor certifications as violative of the clear language of DHS's governing regulations. A clear misinterpretation of governing law "is unquestionably a material deficiency in the regulation." *Coalition for Common Sense in Gov't Procurement v. United States*, 671 F. Supp. 2d 48, 59 (D.D.C. 2009). Moreover, for DOL to require all employers to file applications on a going-forward basis appears likely to be only minimally disruptive. Accordingly, 20 C.F.R. § 655.22(k) will be vacated insofar as it permits only job contractors, and not their clients, to file certification applications.

DOL's errors in passing its prevailing wage rate regulations were also serious. The choice of data sets was made without notice and comment, and "[f]ailure to provide the required notice and to invite public comment . . . is a fundamental flaw that normally requires vacatur of the rule." *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009) (internal quotation marks omitted). Moreover, while the use of skill levels in 20 C.F.R. § 655.10 is invalid for lack of a rational explanation, DOL's failure to provide an explanation for using skill levels in the H-2B program constitutes a recurring issue stretching over more than a decade, and

DOL was, in the context of the 2009 rulemaking, presented with comments alleging fundamental problems with the use of skill levels in the H-2B program. *See* DOL R. 926-27. The magnitude of DOL's errors therefore counsels in favor of vacating the regulations. Doing so, however, would remove the agency's default rule for calculating prevailing wages, resulting in a large gap in the prevailing wage regulations. Those regulations are, of course, a central part of DOL's regulatory scheme and of vital interest to both H-2B workers and U.S. workers in the same industries. The second *Allied-Signal* factor therefore counsels in favor of vacatur without remand.

These circumstances are similar to those encountered by the D.C. Circuit in *Rodway v. USDA*, 514 F.2d 809 (D.C. Cir. 1975). There, the Department of Agriculture "failed to provide public notice and an opportunity for comment before it adopted regulations establishing an allotment system for the federal food stamp program." *Heartland Reg'l Med. Ctr.*, 566 F.3d at 198-99 (discussing *Rodway*). Faced with a serious shortcoming on the part of the agency and with regulations of "critical importance," the court declined to vacate the regulations but ordered the agency "to complete the new rule-making process" within a short period of time. *Rodway*, 514 F.2d at 817-18. Because the issue of wage rates is of similarly central importance, this court will not vacate the regulations but rather, as in *Rodway*, accord the agency 120 days in which to promulgate new, valid regulations for determining the prevailing wage rate in the H-2B program.

## IV. Motion to Expand the Record

Plaintiffs move both to take judicial notice of certain items and to expand the administrative record. This motion will be granted insofar as it seeks judicial notice of (1) DOL's prior H-2B policies and guidance letters, and (2) publicly-available information on

government websites.  *See* n.2, *supra.*[29]

The motion will be denied, however, insofar as it seeks to add the record of the 2004 DOL rulemaking regarding permanent certifications to the administrative record of this case. Plaintiffs do not directly challenge that rulemaking; rather, they challenge the *application* of that rulemaking to the H-2B context via DOL's 2005 guidance letter and the rulemaking at issue. The administrative record of this case therefore properly includes only the records of the DOL and DHS rulemakings that became effective in January 2009.  Further, "[i]n a challenge to administrative action under the APA, the administrative record cannot normally be supplemented." *NVE, Inc.*, 436 F.3d at 189.  The two exceptions to this rule are for situations in which either (1) "'the agency action is adjudicatory in nature and the agency factfinding procedures are inadequate,'" or (2) "'issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action.'" *Id.* (quoting *Overton Park*, 401 U.S. at 415).  "Neither of these situations exists in the instant case," in which plaintiffs challenge a rulemaking, and this court's review is therefore limited "to the administrative record." *Id.*[30] Plaintiffs' motion will therefore be denied in part insofar as it seeks to expand the administrative record.

## V. Preliminary Injunction Motion

---

[29]    Plaintiffs also seek judicial notice of certain summaries of DOL data to support their prevailing wage rate claims.  Because disposition of those claims did not implicate the summaries at issue, that portion of plaintiffs' motion will be dismissed as moot.

[30]    Plaintiffs rely on *Gentile v. Nat'l Oceanographic & Atmospheric Admin.*, No. 87-cv-2192, 1987 WL 18398 (E.D. Pa. Oct. 9, 1987), for the proposition that other exceptions exist to the rule that the record may not be expanded.  To the extent that *Gentile* and *NVE* are inconsistent, however, this court must follow the Third Circuit's precedential opinion in the latter case.

Finally, plaintiffs move for a preliminary injunction. The relief plaintiffs seek is in the form of a notice to H-2B employers that DOL's prevailing wage rates are being challenged in this litigation. As framed by the plaintiffs, the purpose of the injunction is to protect the wages of H-2B workers who begin their employment between the time the injunction issues and the time this court resolves the merits of this dispute. *See* Pls.' PI Mem. at 2-5. Because the order accompanying this opinion constitutes a final judgment on the merits, plaintiffs' request for pre-judgment relief will be dismissed as moot. *See, e.g.*, *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."); *Buckingham Twp. v. United States*, No. 97-cv-6761, 1998 WL 19479, at *9 (E.D. Pa. Jan. 16, 1998) (denying a preliminary injunction motion as moot in light of a summary judgment grant).

## VI. Conclusion

For the foregoing reasons, plaintiffs' motion for summary judgment will granted, and defendants' motion for summary judgment will be denied, to the extent that plaintiffs challenge (1) 20 C.F.R. § 655.15(g), concerning the situations in which H-2B employers must contact unions as a potential source of labor; (2) the portion of 20 C.F.R. § 655.4 defining "full-time"; (3) 20 C.F.R. § 655.22(k), insofar as that provision permits the clients of job contractors to hire H-2B workers without submitting an application to the Department of Labor; (4) the portion of 20 C.F.R. § 655.4 defining "job contractor" to mean an entity that "will not exercise any supervision or control in the performance of the services or labor to be performed other than hiring, paying, and firing the workers"; (5) the phrase "at the skill level" in 20 C.F.R. § 655.10(b)(2); and (6) the second sentence of 20 C.F.R. § 655.10(b)(2), concerning the data

sources used to determine the prevailing wage rate.  The invalidated portions of § 655.4 and § 655.15(g) will be remanded to DOL without vacatur; 20 C.F.R. § 655.22(k) will be vacated in relevant part and remanded to DOL; and the invalidated portions of 20 C.F.R. § 655.10(b)(2) will be remanded to the agency without vacatur but with the instruction that DOL complete a new rulemaking regarding the calculation of prevailing wage rates in the H-2B program within 120 days.  Plaintiffs' motion for summary judgment will otherwise be denied, and defendants' motion for summary judgment will otherwise be granted.

Plaintiffs' motion to expand the administrative record and take judicial notice will be (1) granted insofar as it seeks judicial notice of DOL's prior H-2B regulations and of information available on government websites, (2) denied to the extent it seeks to expand the administrative record, and (3) dismissed as moot to the extent that it seeks judicial notice of summaries of wage information.  Plaintiffs' motion for a preliminary injunction will be dismissed as moot, and defendants' motion to strike certain affidavits will be (1) denied to the extent it applies to the affidavits submitted on May 28, 2010, and (2) dismissed as moot to the extent it seeks to strike later-filed affidavits.

An appropriate order accompanies this opinion.