IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COMITE DE APOYO A LOS | : | CIVIL ACTION |
| TRABAJADORES AGRICOLAS, et. al. | : | |
| | : | |
| v. | : | |
| | : | |
| HILDA SOLIS, in her official capacity as | : | NO. 09-240 |
| United States Secretary of Labor, et. al. | : | |

Legrome D. Davis, J.                                                    March 21, 2013

OPINION

    Plaintiffs Comité de Apoyo a los Trabajadores Agrícolas ("CATA"), Pineros y

Campesinos Unidos del Noroeste ("PCUN"), Alliance of Forest Workers and Harvesters ("the

Alliance"), and Salvador Martinez Barrera challenge federal regulations promulgated by

Defendant agency, the Department of Labor. The case is now before the Court on Plaintiff's

Motion for Permanent Injunctive Relief. (Doc. No. 152).

I.    Factual Background

    a.   The H-2B Program

    The H-2B visa program—named for the statutory section under which it was created[1]—

allows United States employers to bring foreign workers ("H-2B workers") to the United States

to perform temporary, unskilled, non-agricultural work. The H-2B program is distinct from the

H-1B worker program, which permits aliens to temporarily enter the United States to perform

skilled, "specialty occupations," and from the H-2A program, which permits aliens to

temporarily enter the United States to perform unskilled, agricultural labor.

---

[1] Immigration and Nationality Act, Pub. L. No. 82-414, § 101(a)(15)(H)(ii)(B), 66 Stat. 163, 168
(1952), 8 U.S.C. § 1101(a)(15)(H)(ii)(B) ("INA").

The H-2B program is the result of significant political compromise. The program seeks to balance certain industries' temporary need for unskilled foreign workers against a policy interest in protecting United States workers' jobs, salaries, and working conditions.  In furtherance of these dual considerations, the Immigration and Nationality Act (INA) permits the issuance of H-2B visas, only where inter alia: (1) unemployed persons capable of performing such services cannot be found in this country; and (2) the employment of such aliens will not adversely affect the wages and working conditions of United States workers. 8 U.S.C. § 1101(a)(15)(H)(ii)(B); 8 U.S.C. § 1182 (a)(5)(A)(i)(I)-(II).

    b.  Administration of the H-2B Program

The H-2B program is administered by the Department of Homeland Security (DHS) in conjunction with the Department of Labor (DOL).

The INA confers broad authority upon the DHS to admit aliens to this country and to promulgate regulations regarding the issuance of nonimmigrant visas.[2] The statute further provides that: "[t]he question of importing any alien as a nonimmigrant . . . in any specific case

---

[2] 8 U.S.C. § 1184 (a)(1) ("[t]he admission to the United States of any alien as a nonimmigrant shall be for such a time and under such conditions as [the DHS] may by regulations prescribe"). The INA's original language refers to the Attorney General's authority to regulate the H-2B program, but today the program is jointly regulated by the DHS and the DOL. When the DOL was first created in 1913, it housed the Bureau of Immigration and the Bureau of Naturalization. See Act of Mar. 4, 1913, Pub. L. No. 426-62, § 3, 37 Stat. 736, 737.  As early as 1917, the Secretary of Labor and the Bureau of Immigration, then part of the DOL, worked together to manage the importation of laborers into the United States.  See Immigration Act, Pub. L. No. 64-301, ch. 29, 39 Stat. 874, 877-78 (1917).   In 1933, the two bureaus were consolidated to form the Immigration and Naturalization Service ("INS"), which remained part of the DOL.  See Exec. Order No. 6166, § 14 (June 10, 1933), reprinted at 5 U.S.C. §§ 124-132 (1940 ed.).  The INS was transferred to the Department of Justice in 1940, see Reorganization Plan No. V of 1940, reprinted at 5 U.S.C. app. at 545 (2006 ed.), and remained there until it was dissolved by the Homeland Security Act of 2002.  See Pub. L. No. 107-296, § 471, 116 Stat. 2135, 2205. In the Homeland Security Act, Congress further transferred jurisdiction to enforce and administer the immigration laws from the Attorney General and the INS to the DHS and its agencies. Authority to adjudicate nonimmigrant visa petitions, including H-2B petitions, now rests with United States Citizenship and Immigration Services, an agency within the DHS.  6 U.S.C. § 271.

or specific cases shall be determined by [the DHS], after consultation with appropriate agencies of the Government." 8 U.S.C. § 1184(c)(1).

In accordance with the INA, DHS regulations require that the Secretary of Labor determine and certify to the DHS that H-2B applications comport with the INA's requirements. Accordingly, prior to filing an H-2B petition with the DHS, an employer must first apply for and receive a temporary labor certification from the Secretary of Labor. 8 C.F.R. § 214.2 (h)(6)(iii) (2011). Such certification constitutes the DOL's "advice" that the DHS should grant the requested H-2B visa and the certification must confirm that: (1) qualified workers in the United States are not available to perform the position sought; and (2) the alien's employment will not adversely affect wages and working conditions of similarly employed United States workers. 8 C.F.R. § 214.2 (h)(6)(iii)(A), (iv)(A). DHS regulations instruct that the DOL shall "establish procedures" for administering labor certifications within these confines. 8 C.F.R. § 214.2 (h)(6)(iii)(D).

c.  <u>Prevailing Wages</u>

In order to issue a labor certification, the DOL must determine as a threshold matter, that qualified United States workers are not available to fill the position for which an employer seeks foreign workers. As the availability of United States workers is, for obvious reasons, largely determined by the wages that an employer offers, the DOL may only issue labor certifications where United States workers are unavailable to fill a given position at the occupation's "prevailing wage." Labor Certification Process and Enforcement for Temporary Employment in Occupations Other Than Agriculture or Registered Nursing in the United States (H-2B Workers), and Other Technical Changes, 73 Fed. Reg. 78020-01, 78056 (as codified at 20 C.F.R. § 655.10(b)(2)) (Dec. 19, 2008). Accordingly, to apply for a labor certification, an employer must

first obtain from the DOL a prevailing wage determination for the area of intended employment, submit a work order with a state workforce agency serving the geographical area of intended employment, and advertise the position at a wage equal to or higher than the prevailing wage, as established by the DOL. Id. at 78022–23.

i.   Calculation of Prevailing Wages

The DOL's calculation of prevailing wages is of central importance to the H-2B program's success. Nonetheless, over the past three decades, the DOL has periodically changed its method for calculating prevailing wages, without notice and comment, and often without explanation.

From about 1986 until 2008,[3] the DOL issued a series of guidance letters governing the calculation of H-2B prevailing wages.  The DOL's initial guidance letters charged state workforce agencies with making prevailing wage determinations for H-2B occupations, and provided that, in the absence of a collective bargaining agreement, state agencies should use the methodologies set forth in the Davis-Bacon Act ("DBA"),[4] and the McNamara-O'Hara Service Contract Act ("SCA"),[5] to determine prevailing wages.[6] Under this system, state workforce agencies calculated a single prevailing wage for any given occupation in the area of intended employment.

---

[3] A single program called the H-2 visa program formerly encompassed the recruitment of unskilled foreign workers for both agricultural and non-agricultural jobs, and the DOL issued regulations that governed the program—including its non-agricultural component. Immigration and Nationality Act ("INA"), Pub. L. No. 82-414, § 101(a)(15)(H)(ii), 66 Stat. 163, 168 (1952) (creating H-2 visa program). Congress bifurcated the H-2 visa program in 1986 into the H-2A program, for agricultural workers, and the H-2B program, for unskilled, non-agricultural workers. Immigration Reform and Control Act of 1986 ("IRCA"), Pub. L. No. 99-603 § 301(a), 100 Stat. 3359, 3411.

[4] 40 U.S.C. §§ 276a.

[5] 41 U.S.C. §§ 6701 (formerly 41 U.S.C. §§ 351-358).

[6] Interim Prevailing Wage Policy for Nonagricultural Immigration Programs, Gen. Admin. Ltr. No. 4-95, at 1-2 (1995).

In the mid-1990s, the DOL altered its wage methodology to create multiple prevailing wages for each H-2B occupation. The DOL initially divided each H-2B occupation into two skill levels— "entry level"("Level I") or "experienced level" ("Level II")—and calculated a prevailing wage for each level.[7] In 2005, the DOL further divided unskilled, H-2B occupations into four skill and wage levels,[8] borrowing from a system that Congress created to calculate prevailing wages for the H-1B program's skilled, "specialty occupations."[9] Both of these changes were achieved through DOL guidance letters and were not subject to notice and comment rulemaking.

ii.   The 2008 Regulations

On December 19, 2008, the DOL first promulgated regulations to govern H-2B labor certification.[10] The 2008 regulations alter H-2B certification in a number of significant ways. Importantly, the DOL adopted the "2008 Wage Rule" which states: "the prevailing wage for labor certification purposes shall be the arithmetic mean . . . of the wages of workers similarly employed at the skill level in the area of intended employment."[11]

It is undisputed that, in applying the 2008 Wage Rule's phrase "at the skill level," the DOL uses the four-tier methodology that Congress created for the H-1B program and which the DOL adopted without notice and comment in 2005. That is, under the 2008 Prevailing Wage

---

[7] Id. at 5-6.

[8] Mem. to SWA Adm'rs from Emily Stover DeRocco, Asst. Sec'y for Emp't & Training, Revised Prevailing Wage Determination Guidance (May 17, 2005).

[9] Pub. L. No. 108-447, div. J, tit. IV, § 423, 118 Stat. 2809, 3353-54 (codified at 8 U.S.C. § 1182(p)(4)).

[10] Labor Certification Process and Enforcement for Temporary Employment in Occupations Other Than Agriculture or Registered Nursing in the United States (H-2B Workers), and Other Technical Changes, 73 Fed. Reg. 78020-01 (as codified at 20 C.F.R. § 655.10(b)(2)) (Dec. 19, 2008).

[11] 73 Fed. Reg. at 78056 (emphasis added). If there is an applicable collective bargaining agreement, the wage rate in that agreement is used as the "prevailing wage." Employers may submit their own wage data if certain conditions are met.

Rule, the DOL divides each unskilled, H-2B occupation into four separate skill levels and calculates a prevailing wage for each level. With this rule in place, the DOL grants labor certifications for H-2B workers, so long as "qualified" United States workers are not available at the "prevailing wage," in the area of intended employment and at the particular skill level sought. The vast majority of employers who apply for H-2B labor certifications seek workers at an occupation's lowest skill and wage level.[12]

II.   Procedural History

a.   Generally

Plaintiffs initiated the instant litigation in 2009, challenging various aspects of the DOL's 2008 regulations as improperly promulgated under the Administrative Procedure Act (APA).[13] Among those provisions that Plaintiffs challenged was the 2008 Wage Rule.

b.   Invalidation of the 2008 Wage Rule

On August 30, 2010, Honorable Louis H. Pollak of the Eastern District of Pennsylvania held that the DOL improperly promulgated the 2008 Wage Rule's "at the skill level" language. Comite De Apoyo a Los Trabajadores Agricolas v. Solis, No. 09-240, 2010 WL 3431761 (E.D. Pa. Aug. 30, 2010). Judge Pollak reasoned:

> In the absence of any valid regulatory language authorizing the use of skill levels in determining the prevailing wage rate [ ] the four-tier structure of skill levels set out in the guidance letters—which is entirely untethered from any other statutory or regulatory provisions, and which affirmatively creates the wages paid to H–2B workers—constitutes a legislative rule which must be subjected to notice and comment. It has not been so subjected and it [ ] is therefore invalid.

---

[12] Wage Methodology for the Temporary Non-agricultural Employment H-2B Program, 76 Fed. Reg. 3452-0176, 3463 (Jan. 19, 2011) (stating that almost 75% of DOL prevailing wage determinations regard Level I wages—wages based on the mean of the bottom one-third of all reported wages in an given occupation).

[13] This action was originally assigned to Judge Louis H. Pollak but was transferred to this Court on May 16, 2012, following Judge Pollak's death.

Id. at *19. In invalidating the words "at the skill level," the Court stressed that the "DOL has never explained its reasoning for using skill levels as part of H-2B prevailing wage determinations" and that the system has never been subject to notice and comment, as the APA requires. Id. at *19, *25.

Judge Pollak further found that the DOL's errors in promulgating the 2008 Wage Rule were "serious" and of a magnitude that counseled in favor of vacating the Regulation. Id. at *25 ("while the use of skill levels in 20 C.F.R. § 655.10 is invalid for lack of a rational explanation, DOL's failure to provide an explanation for using skill levels in the H–2B program constitutes a recurring issue stretching over more than a decade, and DOL was, in the context of the 2009 rulemaking, presented with comments alleging fundamental problems with the use of skill levels in the H–2B program"). Nonetheless, as the Court invalidated the Regulation due to the DOL's procedural errors, Judge Pollak did not vacate the 2008 Wage Rule's skill-level methodology, thereby circumventing a potentially unnecessary regulatory gap. Id. Judge Pollak remanded the Rule to the DOL and ordered that the DOL validly promulgate a replacement regulation within 120 days, pursuant to the APA's procedures for notice and comment rulemaking. Id.

    c.  The 2011 Rule

Following Judge Pollak's August 30, 2010 opinion, the DOL initially engaged in efforts to validly promulgate a prevailing wage regulation. In doing so, the DOL issued a notice of proposed rulemaking. This notice stated that, following Judge Pollak's August 30, 2010 opinion, the DOL independently concluded that the 2008 Wage Rule's skill-level methodology did not comport with the DOL's regulatory and statutory mandate, because the methodology did not produce "the appropriate wage necessary to ensure that U.S. workers are not adversely affected

by the employment of H-2B workers." Wage Methodology for the Temporary Non-Agricultural Employment H-2B Program, 75 Fed. Reg. 61578-01, 61579 (October 5, 2010).

Following notice and comment, the DOL announced a revised prevailing wage regulation in January 2011 ("the 2011 Wage Rule"). Wage Methodology for the Temporary Non-agricultural Employment H-2B Program, 76 Fed. Reg. 3452-0176 (Jan. 19, 2011). The 2011 Wage Rule's preamble explains that the Rule was promulgated in response to findings that the 2008 Wage Rule "artificially lowers [ ] wage[s] to a point that [they] no longer represent[ ] market-based wage[s] for the occupation." Id. at 3477.  The document reasons:

> The predominance of Level I wages in the program, wages based on the mean of the bottom one-third of all reported wages in the systems, is itself evidence of the adverse impact of those wages on those U.S. workers performing the same tasks and engaged in the same jobs. Specifically, a review of the Department's records for the issuance of prevailing wages in calendar year 2010 indicates that almost 75 percent of jobs are classified at a Level I wage, with the remaining 25 percent scattered in Levels II, III and IV. In a broader examination of wages offered over the past several years, in about 96 percent of cases, the H-2B wage is lower than the mean of the OES wage rates for the same occupation [ ]. In a low-skilled occupation, the mean for the occupation represents the wage that the average employer is willing to pay for unskilled workers to perform that job. The four-tier structure artificially lowers that wage to a point that it no longer represents a market-based wage for that occupation. The H-2B worker, along with the domestic workers recruited against the application, who are being paid a significantly lower wage than two-thirds of those in that area of employment cannot help but have a depressive effect on the wages of those around him. An employer paying U.S. workers as well as H-2B workers has no incentive to pay the U.S. workers any higher compensation. The local competitors, by extension, have no incentive to pay a higher compensation. Therefore, it follows that if the employer must only offer and pay Level I wages, wages below what the average similarly employed worker is paid, those wages will make the U.S. workers less likely to accept those job opportunities or will require them to accept the job at a wage rate less than the market has determined is prevailing for the job. The net result is an adverse effect on the worker's income.

Id. at 3463. The 2011 Rule's preamble concludes: "continuing the current calculation methodology… does not provide adequate protections to U.S. and H-2B workers," thereby violating both the INA and the DHS' mandates. Id. at 3471, 3477.

d.  Delays in Enforcing the 2011 Rule

Despite acknowledging the 2008 Wage Rule's substantive flaws, the DOL has not yet implemented the 2011 Wage Rule and continues to use the 2008 Wage Rule.

The DOL initially set January 1, 2012 as the 2011 Wage Rule's effective enforcement date—almost a full year following the Rule's publication. Id. at 3452. On June 15, 2011, however, Judge Pollak vacated the January 1, 2012 enforcement date and ordered that the DOL announce an earlier effective date within 45 days. Comite De Apoyo a Los Trabajadores Agricolas v. Solis, No. 09-240, 2011 WL 2414555 (E.D. Pa. June 16, 2011). In response to Judge Pollak's Order, the DOL set the Rule to take effect on September 30, 2011. Nonetheless, the DOL has since postponed the Rule's effective date on four subsequent occasions.[14] Most recently, the DOL postponed the Rule's effective date until March 27, 2013 and now represents that additional delays are expected.[15]

The DOL's three most recent postponements respond to appropriations concerns. On November 18, 2011, Congress passed the Consolidated and Further Continuing Appropriations Act. Consolidated and Further Continuing Appropriations Act, 2012, Pub. L. No. 112-55, 125 Stat 552, Div. B, Title V, § 546 (2011). A rider to this Act contains language that bars the DOL from expending funds to implement the 2011 Wage Rule. The conference report accompanying the Act states that the purpose of the postponement is to "allow congress to address" the 2011 Wage Rule. H.R. Rep. No. 112-284 (2011) (Conf. Rep.). The report further directs the DOL to

---

[14] Wage Methodology for the Temporary Non-Agricultural Employment H-2B Program; Delay of Effective Date; Impact on Prevailing Wage Determinations, 76 Fed. Reg. 82116-01 (Dec. 30, 2011); Wage Methodology for the Temporary Non-Agricultural Employment H-2B Program; Delay of Effective Date, 76 Fed. Reg. 73508-01 (Nov. 29, 2011); Wage Methodology for the Temporary Non-Agricultural Employment H-2B Program; Postponement of Effective Date, 76 Fed. Reg. 59896-01 (Sept. 28, 2011).

[15] Wage Methodology for the Temporary Non-Agricultural Employment H-2B Program; Delay of Effective Date, 77 Fed. Reg. 60040-01 (Oct. 2, 2012).

continue using the 2008 Wage Rule until January 1, 2012. Id. Since November 18, 2011, two additional appropriations riders have denied funding for the 2011 Wage Rule. Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, 125 Stat. 786, Div. F, Title I § 110 (2011); Continuing Appropriations Resolution, 2013, Pub. L. No. 112-175, 126 Stat 1313 (2012). These riders have not, however, directed that the DOL continue utilizing the invalidated 2008 Wage Rule or any other specific wage methodology. Id. Moreover, Congress has not acted to "address" the 2011 Wage Rule since passing the Consolidated and Further Continuing Appropriations Act in November 2011, and the parties anticipate that such action is unlikely.

The DOL now continues to use the 2008 Wage Rule, nearly thirty (30) months after Judge Pollak invalidated the Rule, and two years after the DOL found that the Rule violates the DOL's statutory and regulatory mandates. While the DOL anticipates continued barriers to funding the 2011 Rule, the DOL has not engaged in any efforts to promulgate a new regulation or to otherwise validly grant H-2B labor certifications. Hr'g Tr. 26:13–28:5; 21:11–23:23, Nov. 28, 2012. Plaintiffs now move this Court to vacate the 2008 Wage Rule and to bar its continued use.

III.   Discussion

In its current posture, this case presents a narrow question: Whether the DOL's continued use of the 2008 Wage Rule—which has been found procedurally invalid by this Court and substantively invalid by the DOL—justifies vacating the Rule and barring the Rule's continued use. For the reasons set forth below, we answer this question affirmatively.

a.   Judicial Review of Agency Action

Section 706 of the APA governs judicial review of agency action. Section 706(2) empowers a court to "hold unlawful and set aside" agency action that the court finds, inter alia:

(A) Arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

. . .

(C) In excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or

(D) Without observance of procedure required by law.

Judicial review under the APA focuses on the agency's decision-making process, not on the decision itself. NVE, Inc. v. Dep't of Health & Human Servs., 436 F.3d 182, 190-91 (3d Cir. 2006). While "a court is not to substitute its judgment for that of the agency," in an APA challenge, the court must ensure that the agency has properly applied APA rulemaking procedures and reached a rational conclusion. Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Section 706 provides separate standards of review for procedural and substantive agency errors. Nonetheless, the line between procedure and substance is not always clear, and errors in procedural decision-making are often indicative of underlying substantive errors.

      i.  Procedural Review

      1.  Standard of Review

Section 706(2)(D) of the APA provides that a court shall "hold unlawful and set aside" agency action that is, "[w]ithout observance of procedure required by law." 5 U.S.C. § 706(2)(D). Courts ubiquitously understand Section 706(2)(D) to require that a reviewing court invalidate agency regulations that do not comport with the APA's rulemaking procedures. See, e.g., W.C. v. Bowen, 807 F.2d 1502, 1505 (9th Cir. 1987) ("An agency rule which violates the APA is void … Agency action taken under a void rule has no legal effect.").

      2.  Discussion

On August 30, 2010, Judge Pollak held that the DOL invalidly promulgated the 2008 Wage Rule's "at the skill level" language, because the Rule was not subject to public notice and comment, as the APA requires. Comite De Apoyo A Los Trabajadores Agricolas v. Solis, No. 09-240, 2010 WL 3431761 at *19 (E.D. Pa. Aug. 30, 2010). Judge Pollak accordingly invalidated the Rule under Section 706(2)(D).

As Judge Pollak invalidated the 2008 Wage Rule solely due to the DOL's procedural errors, Judge Pollak did not vacate the Regulation.[16] Rather, Judge Pollak remanded the Rule to the DOL and ordered that the DOL validly promulgate a replacement regulation within 120 days. Id.  In remanding the Rule without vacatur, Judge Pollak circumvented a potentially unnecessary regulatory gap; yet, he acknowledged that where a regulation constitutes a clear misinterpretation or violation of governing law, vacatur is the appropriate remedy. Id. (vacating a portion of the 2008 Regulations requiring only job contractors—and not their employer clients—to file applications for labor certifications, as violative of the clear language of DHS's governing regulations).

     ii.   Substantive Review

---

[16] In remanding the 2008 Prevailing Wage Rule, Judge Pollak adopted the framework set out by the D.C. Circuit in Allied–Signal Inc. v. U.S. Nuclear Regulatory Comm'n., 988 F.2d 146, 150–51 (D.C. Cir.1993) (holding that in determining whether to vacate regulations that violate the APA, a court should consider "the seriousness of the [rule's] deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed."). In applying Allied-Signal, Judge Pollak acknowledged that "[n]either the Supreme Court nor the Third Circuit has ruled on the specific permissibility of the D.C. Circuit's approach." Id. Judge Pollak further found that, where a regulation constitutes a clear misinterpretation or violation of governing law, vacatur is the appropriate remedy. Id. (vacating a portion of the 2008 Regulations requiring only job contractors, and not their employer clients, to file applications for labor certifications as violative of the clear language of DHS's governing regulations).

Section 706(2) of the APA further empowers a court to "hold unlawful and set aside" agency action that the court finds: (1) "[i]n excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or (2) "[a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 706(2)(A), (C).

Agency regulations are extensions of the legislative process and carry the force and effect of law. Nonetheless, as agencies acquire their rulemaking authority from specific statutory provisions, an agency "may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law," regardless of the importance of the problem that an agency seeks to address. Food & Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 125, 120 S. Ct. 1291, 1297, 146 L. Ed. 2d 121 (2000) (citing ETSI Pipeline Project v. Missouri, 484 U.S. 495, 517, 108 S.Ct. 805, 98 L.Ed.2d 989 (1988); Chevron U.S.A. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)) (internal quotations omitted). The Supreme Court explains that, in order for a regulation to have "the force and effect of law" it is necessary to establish a "nexus between the regulation[ ] and some delegation of the requisite legislative authority by Congress." Chrysler Corp. v. Brown, 441 U.S. 281, 304, 99 S. Ct. 1705, 1718, 60 L. Ed. 2d 208 (1979).

### 1.  Section 706(2)(C)

#### a.  Standard of Review

Under APA Section 706(2)(C), an administrative agency may not act "[i]n excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

Our evaluation of whether an agency has acted consistently with the limitations of its delegated authority "begins with a delineation of the scope of the [agency's] authority and discretion." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415-16, 91 S.Ct.

814, 823, 28 L.Ed.2d 136 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99, 97 S. Ct. 980, 51 L. Ed. 2d 192 (1977); Schilling v. Rogers, 363 U.S. 666, 676-77, 80 S.Ct. 1288, 1295-96, 4 L.Ed.2d 1478 (1960); Wilkinson v. Abrams, 627 F.2d 650, 659-60 (3d Cir. 1980). Our review focuses on whether we can reasonably conclude that the agency's grant of authority contemplates the actions taken, and where an agency's authority is limited to "a small range of choices," we must determine whether the agency's actions can be reasonably said to fall within that small range. Citizens to Preserve Overton Park, 401 U.S. at 415-16; see also Chrysler Corp., 441 U.S. at 308; NVE, Inc. v. Dep't of Health & Human Servs., 436 F.3d 182, 190-91 (3d Cir. 2006); Dow Chem. Co. v. U.S. E.P.A., 605 F.2d 673, 682 (3d Cir. 1979).

b.   Discussion

The DOL's role with regard to the H-2B program is to issue labor certifications. Such certifications constitute "advice" to the DHS that a particular H-2B application comports with the INA's requirements and that the DHS should grant the requested H-2B visa. 8 C.F.R. § 214.2 (h)(6)(iii)(A). The DOL's authority to grant labor certifications is specific and narrow and derives directly from the INA and from DHS regulations.

The INA specifies that the DHS may only issue H-2B visas, where inter alia: (1) unemployed persons capable of performing such services cannot be found in this country; and (2) the employment of such aliens will not adversely affect the wages and working conditions of United States workers. 8 U.S.C. § 1101(a)(15)(H)(ii)(B); 8 U.S.C. § 1182(a)(5)(A)(i)(I)-(II). The statute further provides that: "[t]he question of importing any alien as a nonimmigrant . . . in any specific case or specific cases shall be determined by [the DHS], after consultation with appropriate agencies of the Government." 8 U.S.C. § 1184(c)(1).

In accordance with the INA, the DHS names the DOL an agency with which it consults regarding the issuance of H-2B visas, and a DOL labor certification constitutes the DOL's advice that the DHS should grant a particular H-2B visa. 8 C.F.R. § 214.2 (h)(6)(iii)(A). DHS regulations further reiterate that each DOL labor certification shall confirm that: (1) qualified workers in the United States are not available to perform the position sought; and (2) the alien's employment will not adversely affect wages and working conditions of similarly employed United States workers. 8 C.F.R. § 214.2 (h)(6)(iv)(A).

Labor certifications issued under the 2008 Wage Rule exceed the DOL's delegated authority. The INA and DHS regulations define a small subset of individuals to whom the DOL may grant labor certifications if, and only if, the DOL can assure that such individuals' receipt of H-2B visas will not adversely affect United States workers. While the DOL lacks authorization to issue labor certifications absent such assurance, the DOL acknowledges that certifications granted under the 2008 Wage Rule "artificially lower[ ] wage[s] to a point that [they] no longer represent[ ] market-based wage[s] for the occupation" and that such certifications "cannot help but have a depressive effect on the wages of [United States workers]." 76 Fed. Reg. 3452-0176, 3477. Accordingly, labor certifications issued under the 2008 Wage Rule fall directly outside the narrow range of circumstances under which the DOL is authorized to issue labor certifications and exceed the bounds of the DOL's delegated authority under Section 706(2)(C) of the APA. We therefore invalidate the 2008 Wage Rule under this provision.

### 2.   706(2)(A)

#### a.   Standard of Review

Under APA Section 706(2)(A) a legislative rule has no legal effect if it is arbitrary, capricious, or manifestly contrary to the statute. 5 U.S.C. § 706(2)(A); Chevron U.S.A., Inc. v.

Natural Res. Def. Council, Inc., 467 U.S. 837, 843-44, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984).
We further invalidate the 2008 Wage Rule under Section 706(2)(A).

In determining whether a rule comports with Section 706(2)(A), we must "give effect to
the unambiguously expressed intent of Congress" and we must assure that the regulation
harmonizes with the language of the statute, its origin, and its purpose. Food & Drug Admin. v.
Brown & Williamson Tobacco Corp., 529 U.S. 120, 126, 120 S. Ct. 1291, 1297, 146 L. Ed. 2d
121 (2000) (internal citations omitted); Sekula v. F.D.I.C., 39 F.3d 448, 452 (3d Cir. 1994).
While an agency's interpretation of a statute is generally given great deference, a regulation that
conflicts with a statute's plain language is not entitled to judicial deference. Chevron, 467 U.S. at
843-44; K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 292, 108 S. Ct. 1818, 100 L. Ed. 313 (1988).

We conduct our substantive review of legislative rules under the arbitrary and capricious
standard unless the source of an agency's delegated authority compels an alternate standard of
review. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29,
44, 103 S. Ct. 2856, 77 L. Ed. 2d. 443 (1983); Dickenson v. Secretary of Def., 68 F.3d 1396,
1404 n. 12 (D.C. Cir. 1995); Mt. Graham Red Squirrel v. Espy, 986 F.2d 1568, 1571 (9th Cir.
1993). To determine whether an agency acted arbitrarily and capriciously, we look to whether
the agency relied on factors outside of those that Congress intended for consideration,
completely failed to consider an important aspect of the problem, or provided an explanation that
is contrary to, or implausible in light of, the evidence. Motor Vehicle Mfrs., 463 U.S. at 44;
Pennsylvania Dep't of Pub. Welfare v. United States Dep't of Health and Human Servs., 101 F.3d
939, 943 (3d Cir. 1996). Our review focuses on the agency's decision-making process, rather
than the decision itself, and we need only ensure that the agency has reached a rational
conclusion. Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43. Under this standard, a rule that is in

direct variance with an unambiguous statutory provision is void. See Brown & Williamson

Tobacco Corp., 529 U.S. at 125-126; Sekula, 39 F.3d at 452 (3d Cir. 1994); Diersen v. Chicago

Car Exchange, 110 F.3d 481, 486 (7th Cir. 1997), cert denied, 552 U.S. 868, 118 S. Ct. 178, 138

L. Ed. 2d 119 (1997).

b.   Discussion

Both the INA and the DHS' implementing regulations encompass a number of difficult

policy choices. Our role at this stage is not to determine whether these policy choices are

desirable. Rather, our role is confined to assessing whether the 2008 Wage Rule gives effect to

the unambiguous language of the legislation and regulations as drafted by Congress and the

DHS. Dow Chem. Co. v. U.S. E.P.A., 605 F.2d 673, 689-90 (3d Cir. 1979).

Viewing the INA as a whole, it is evident that one of the Act's core objectives is to

balance certain industries' temporary need for foreign workers against a policy interest in

protecting United States workers' jobs, salaries, and working conditions. This essential purpose

pervades both the INA and the DHS' implementing regulations. For instance, Congress and the

DHS explicitly preclude the grant of labor certifications to foreign workers whose employment

may "adversely affect wages and working conditions of similarly employed United States

workers." 8 U.S.C. § 1182(a)(5)(A)(i)(II); 8 C.F.R. § 214.2 (h)(6)(iv)(A). Additionally, the INA

permits the DHS to impose civil monetary penalties upon H-2B employers who fail to comport

with H-2B requirements, and the Statute instructs that "[i]n determining the level of penalties to

be assessed … the highest penalties shall be reserved for willful failures to meet any of the

conditions … that involve harm to United States workers." 8 U.S.C. § 1184(c)(14)(A), (C).

Here, Congress has directly spoken to the issue before us and has precluded the DOL

from granting H-2B labor certifications absent confirmation that an "alien's employment will not

17

adversely affect wages and working conditions of similarly employed United States workers." 8 U.S.C. § 1101(a)(15)(H)(ii)(B); 8 U.S.C. § 1182 (a)(5)(A)(i)(I)-(II). Despite acknowledging this restriction, the DOL further acknowledges that the 2008 Wage Rule permits certifications which: (1) "artificially lower[ ] wage[s] to a point that [they] no longer represent [ ] market-based wage[s] for the occupation" and; (2) "have a depressive effect on the wages of [United States workers]." 76 Fed. Reg. 3452-0176, 3477. Such consequences plainly contradict congressional policy and render the 2008 Wage Rule invalid under Section 706(2)(A).

>    b.   Remedies

Section 706(2) of the APA provides that a reviewing court shall "hold unlawful and <u>set aside</u> agency action" that violates the APA's procedural or substantive provisions. 5 U.S.C. § 706(2) (emphasis added). Courts traditionally understand Section 706(2) to mean that, when a reviewing court deems an agency regulation invalid, the court should vacate the rule and then remand the issue back to the agency for further review. <u>Abington Mem. Hosp. v. Heckler</u>, 750 F.2d 242, 244 (3d Cir. 1984). By vacating an invalid rule, a reviewing court leaves the agency with four options: (1) reenact the same rule with an amended procedure or justification; (2) replace the rule with a substantively different rule; (3) request severance of the invalid portions of the rule from those portions deemed valid; or (4) abandon the rulemaking effort altogether.

The DOL argues that we should not vacate the 2008 Wage Rule even though the Rule is procedurally and substantively invalid and violates three separate provisions of the APA. Rather, the DOL urges that we remand the issue back to the DOL for further consideration and leave the invalid 2008 Wage Rule in place in the interim. The DOL's argument rests upon a line of D.C. Circuit cases, which find remand without vacatur appropriate under certain circumstances.  <u>See, e.g.</u>, <u>Allied-Signal Inc. v. U.S. Nuclear Regulatory Comm'n</u>, 988 F.2d 146 (D.C. Cir. 1993).

In assessing the appropriate remedy in this action, we note as a preliminary matter that this is hardly an ordinary case. The DOL has come before this Court and expressly acknowledged the limits that the INA and DHS regulations set upon its rulemaking authority. The DOL further acknowledges that the 2008 Wage Rule contradicts these limits. Nonetheless, after the DOL acknowledged the 2008 Wage Rule's defects and promulgated an unsuccessful replacement rule, the DOL entirely stopped in its tracks. The DOL now expresses that it has no intention of taking further action to bring the DOL's H-2B labor certification into statutory and regulatory compliance and instead urges that we leave undisturbed a rule that this Court found procedurally invalid thirty months ago and that has since been declared substantively invalid by the very agency that now urges us to leave the Rule in place.

The DOL correctly highlights that a line of D.C. Circuit cases finds remand without vacatur appropriate under certain circumstances. In this Court's view, however, remand without vacatur is not easily squared with Section 706(2)'s seemingly mandatory language—which requires that we "hold unlawful and set aside agency action" that violates the APA.[17] Importantly, neither the Supreme Court nor the Third Circuit has held that the APA permits a court to remand an invalid regulation without first vacating the regulation. See, e.g., Council Tree Communications, Inc. v. F.C.C., 619 F.3d 235, 258 n. 13 (3d Cir. 2010) ("we express no view as to whether we are authorized to order this remedy").

---

[17] Courts also increasingly question this procedure's practical implications for individual cases and its systematic effects on the balance of government powers. See, e.g., In re Core Communications, Inc., 531 F.3d 849, 862 (D.C. Cir. 2008) (Griffith, J., concurring) ("experience suggests that this remedy sometimes invites agency indifference"); Natural Res. Def. Council v. EPA, 489 F.3d 1250, 1262–64 (D.C. Cir. 2007) (Randolph, J., concurring) ("A remand-only disposition is, in effect, an indefinite stay of the effectiveness of the court's decision and agencies naturally treat it as such."); Milk Train, Inc. v. Veneman, 310 F.3d 747, 758 (D.C. Cir. 2002) (Sentelle, J., dissenting) (declaring remand without vacatur unlawful).

Irrespective of the permissibility of the DOL's request, we find that the facts of this case counsel in favor of vacating the 2008 Wage Rule. The practical effect of remand without vacatur is that an invalid rule remains in place while an agency works to correct its errors. This approach is often sensible where an agency promulgates a substantively valid rule through an invalid process and the agency will likely promulgate the same rule through a proper process on remand. Nonetheless, remand without vacatur is far less logical where, as here, a court finds that a rule directly contradicts an agency's authority and the agency expresses no intention of timely correcting its error. In such circumstances, to leave an invalid rule in place is for a reviewing court to legally sanction an agency's disregard of its statutory or regulatory mandate. Absent instruction that the APA permits such a remedy, we decline to grant the DOL's seemingly irreconcilable request. See Food & Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 123, 120 S. Ct. 1291, 1296, 146 L. Ed. 2d 121 (2000) (internal quotations and citations omitted) ("No matter how important, conspicuous, and controversial the issue … an administrative agency's power to regulate … must always be grounded in a valid grant of authority … [and we] must take care not to extend the scope of the statute beyond the point where Congress indicated it would stop.").

We further note that we would decline to grant the DOL's request even if we adopted the D.C. Circuit's approach. The D.C. Circuit holds that, when a reviewing court finds an agency rule invalid, the court should weigh: (1) "the seriousness of the [rule's] deficiencies (and thus the extent of doubt whether the agency chose correctly)" against (2) the "disruptive consequences" of vacatur. See Allied-Signal Inc. v. U.S. Nuclear Regulatory Comm'n, 988 F.2d 146, 150-51 (D.C. Cir. 1993). If the disruptive consequences of vacatur outweigh an invalid rule's

deficiencies, the D.C. Circuit finds that the reviewing court should remand the rule to the agency without first vacating the rule. Id.

Allied-Signal's first prong asks that we consider the seriousness of the DOL's errors. With regard to the DOL's procedural errors, Judge Pollak held that the "DOL has never explained its reasoning for using skill levels as part of H-2B prevailing wage determinations" and that the system has never been subject to notice and comment, as the APA requires. Comite De Apoyo A Los Trabajadores Agricolas v. Solis, No. 09-240, 2010 WL 3431761 at *25 (E.D. Pa. Aug. 30, 2010). Judge Pollak further found that the DOL's procedural errors were "serious" and of a magnitude that counseled in favor of vacating the Regulation. Id. at *25 ("[W]hile the use of skill levels in 20 C.F.R. § 655.10 is invalid for lack of a rational explanation, DOL's failure to provide an explanation for using skill levels in the H–2B program constitutes a recurring issue stretching over more than a decade, and DOL was, in the context of the 2009 rulemaking, presented with comments alleging fundamental problems with the use of skill levels in the H–2B program."). Nonetheless, as the Court did not make findings regarding the substantive validity of the 2008 Wage Rule, Judge Pollak did not vacate the Rule, thereby circumventing a potentially unnecessary regulatory gap. Id.

With regard to substantive errors, Allied-Signal's first prong further asks that we consider "the extent of doubt whether the agency chose [its action] correctly." 988 F.2d at 150-51. This language suggests that we should consider the likelihood that the agency can provide a valid explanation for its rule on remand. Here, as the 2008 Wage Rule directly contradicts the INA's statutory language and the DOL has independently concluded that the Rule contravenes its statutory and regulatory mandate, we find inconceivable that the DOL will proffer support for the 2008 Wage Rule on remand.

The DOL argues that, despite the 2008 Wage Rule's procedural and substantive flaws, the disruptive consequences of vacatur outweigh the seriousness of the 2008 Wage Rule's deficiencies. In support of this assertion, the DOL highlights that, when a rule is vacated, an agency generally reverts to the status quo ante (the prior rule). In this case, however, there is not a valid prior rule upon which the DOL can rely, because the DOL similarly violated the APA's rulemaking procedures in creating the predecessor wage-regime. The DOL now argues that vacatur would be unusually disruptive, because the DOL's history of APA violations has left the DOL without a valid regulatory mechanism with which to implement the H-2B program, thereby requiring that the DOL grant labor certifications on an individual, ad hoc basis until the DOL promulgates a valid rule.

We find the DOL's arguments unpersuasive. Although vacating the 2008 Rule might disrupt the H-2B program's current structure, Congress has not granted the DHS and DOL unfettered authority to issue H-2B visas. Rather, in passing the INA, Congress defined a small subset of individuals who may receive H-2B visas if, and only if, the DHS can ensure that such visas will not adversely affect United States workers. Absent this assurance, the DHS is not authorized to issue H-2B visas.

Despite clear constraints on the DHS and DOL's authority, the DOL explicitly finds that the 2008 Wage Rule creates cognizable adverse consequences for United States workers. Accordingly, our vacating the 2008 Wage Rule will only disrupt the H-2B program to the extent that the DHS and DOL use the program to issue H-2B visas that they are expressly prohibited from granting. In light of the extent and seriousness of the DOL's errors, as well as the DOL's representation that the DOL is not engaging in efforts to validly grant H-2B labor certifications, this consequence hardly compels leaving the 2008 Wage Rule in place, even under the D.C.

Circuit's jurisprudence. For the foregoing reasons, we find that vacatur of the 2008 Wage Rule is the only appropriate remedy under these unusual circumstances.

IV.    <u>Conclusion</u>

For the foregoing reasons, Plaintiffs' Motion for Permanent Injunctive Relief is GRANTED. The 2008 Wage Rule, 73 Fed. Reg. 78020-01, 78056 (as codified at 20 C.F.R. § 655.10(b)(2)) (Dec. 19, 2008), is VACATED AND REMANDED to the Department of Labor. The DOL shall come into compliance within thirty (30) days. An appropriate Order has been filed separately.

BY THE COURT:

s/Legrome D. Davis

Legrome D. Davis, J.